769 A.2d 982

**GREGG NECK YACHT CLUB, INC.,**

**v.**

**COUNTY COMMISSIONERS OF KENT COUNTY, Maryland.**

**No. 562, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 3, 2001.

734

736

738

Harris P. Murphy (Allewalt & Murphy, P.A., on the brief), Chestertown, for appellant.

Ernest S. Cookerly (Cookerly & Barroll, LLC, on the brief), Chestertown, for appellees.

Argued before DAVIS, HOLLANDER, and CHARLES E. MOYLAN, Jr. (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This case involves a dispute concerning ownership of real property, structural improvements, and riparian rights. We must decide, *inter alia*, whether a deed executed in 1950 conveyed an easement to Kent County or, instead, a fee simple interest that included riparian rights and now encompasses a pier constructed some forty years ago by Gregg Neck Yacht Club, Inc. ("GNYC"), appellant. The pier, situated on the Sassafras River, is at the heart of this dispute.

This litigation was spawned by Kent County's decision on October 12, 1999, to claim ownership of the pier. That action led GNYC to file suit in the Circuit Court for Kent County on October 25, 1999, against the County Commissioners of Kent County (the "County") and the Kent County Department of Public Works (the "Department"), appellees. In its declaratory judgment action, amended on December 1, 1999, GNYC asked the court to determine "the intent of the 1950 grant to the County and the property rights arising therefrom." [1] GNYC also asked the court to declare that appellees were estopped from asserting any rights to the pier or riparian rights. Alternatively, GNYC sought a declaration of ownership by adverse possession.

On April 12, 2000, the circuit court convened an evidentiary hearing, at which numerous witnesses testified and many exhibits were introduced. The hearing proceeded in phases, with the court resolving various issues, seriatim. Ultimately, the court found that the 1950 Deed conveyed a fee simple interest in the disputed land to the County, which necessarily included riparian rights. The court also determined that the County was not estopped from asserting its interests. As a result, the court concluded that the pier built by GNYC

---

1. The amended complaint added Gregg Neck Park Civic Association, Inc. as a defendant. The Association did not file an answer and is not a party to this appeal.

belongs to the County. This appeal followed, in which appellant presents two questions for our review:

I. Did the trial court err when it determined that the 1950 deed conveyed to the County a fee simple estate rather than an easement?

II. Did the trial court err in failing to determine that appellees either acquiesced to the ownership of appellant, or should be equitably estopped from asserting an interest in the subject pier as against appellant?

For the reasons that follow, we shall reverse.

## FACTUAL SUMMARY

On July 6, 1950, J. Early Wood and his wife, Mary, executed a conveyance to the County of a 40 foot wide "right of way or strip of land," recorded in the land records, "to be used in the extension, construction, improvement and maintenance of [a] County road." The 1950 Deed did not mention riparian rights, nor did it use the words "in fee simple." The Deed stated, in part:

WHEREAS the State Roads Commission of Maryland proposes to extend and improve the County road leading from Route 290 (Galena to Sassafras) into Gregg Neck Subdivision in Kent County, and whereas the extension and improvement of said County road will be a material benefit to the adjoining landowners and useful to the general public.

NOW, THEREFORE, THIS DEED WITNESSETH that in consideration of the premises, we do hereby give and grant unto the County Commissioners of Kent County to be used in the extension, construction, improvement and maintenance of the aforesaid County road, a *right of way* or strip of land forty (40) feet in width and more particularly described as follows:

BEGINNING at the end of the County Road running from the State Road (leading from Galena to the head of Sassafras and known as Route 290) into Gregg Neck and approximately one-half mile distant from said State Road through the property of J. Early Wood and wife and run-

ning from said point, a right of way 40 feet in width the following courses and distances over other lands of the said J. Early Wood and wife into said Gregg Neck ...

\* \* \*

AND we further grant to the said County Commissioners of Kent County, or their agents, the right to construct, use and maintain such pipes, culverts and drainage structures as they may desire to construct for the purpose of draining said road, together with the right to create and maintain our land adjacent thereto such slopes as are necessary to support and maintain the aforesaid right of way, and/or adjacent land, at the grades of said road as now proposed.

According to appellant, "[t]he course and distance measurements set forth in the grant are unreliable." Appellant explains: "If the measurements in the [1950] deed are followed, the right-of-way extends into the Sassafras River [Mill Creek]. The actual roadway, known as Mill Road, follows a course that puts its terminus near Mill Creek. This is the location of the pier in question and has served as a County landing." The public has consistently used the landing, which the County maintains. In contrast, GNYC built, used, and maintained the pier.

In 1959, nine years after the conveyance by Wood, GNYC was incorporated by residents of the Gregg Neck Park development. That same year, GNYC applied to the Army Corps of Engineers for permission to construct the pier in issue, located at what is now the end of Mill Road. By permit dated March 29, 1959, the Army Corps of Engineers authorized construction of a pier to extend fifty feet channelward of the mean high water line in the Sassafras River (Mill Creek), at a point on the south shore at Gregg Neck Park. The survey plats of the Gregg Neck Park subdivision show Sassafras Avenue, sometimes referred to as Mill Road, extending to the water's edge. Mill Road and Oxford Road are the only two roads in Gregg Neck Park that run to the water.

The pier was constructed in late 1959 or early 1960. Michael Scott, a registered property line surveyor, performed a

survey at the request of the County, and testified that "[t]he pier is located within . . . the 40 foot right-of-way. At the end of that road." Additionally, Scott prepared a plat that shows a pier extending about 70 feet into the creek, in the shape of an "L"; the "L" measures 69.93 feet. According to appellees, "There was no authority granted for the construction of the 'L' and the dock exceeded the authority granted by the Army Corps of Engineers."

Nevertheless, Elizabeth Smith, who was treasurer of GNYC from 1971 to 1988, and a resident of Gregg Neck Park for 31 years, testified that the County knew of the construction of the pier by GNYC. She said: "I don't know if they were asked about it or not, but they certainly knew it was going up because I would call at different times—I asked about it." During her testimony, the parties stipulated that GNYC has consistently paid corporate taxes. It also incurred expenses regularly to maintain the pier, dating to 1971, in the total sum of $10,039.74.

Daniel Fleming, President of GNYC, testified about a letter dated June 29, 1961, from Wood, the grantor, to Clyde Wilgus, the first president of GNYC and founder of the Gregg Neck Park Civic Association, Inc. ("Association"). He stated, in relevant part:

I must call your attention to the fact that your organization is using all the facilities of the beaches and anchorages of Gregg Neck Park without assuming the ownership of the roads leading to them.

I am anxious to divest myself of this responsibility without further delay.

Will you please advise me promptly what the intentions of the Gregg Neck Yacht Club, Inc. are with regard to taking over the roads.

One year later, on July 10, 1962, Wood and his wife conveyed to the Association, in fee simple, some 17.5 acres, which expressly included riparian rights but excluded the conveyance to the County pursuant to the 1950 Deed. The 1962 Deed stated, in part:

All of the right, title, interest and estate of the said Grantors in and to all that right of way 50 feet wide and that easement area throughout the development known as Gregg Neck Park.... Containing 17½ acres, more or less.

Being all of the right of way and easement areas as shown on the revised plat of the development known as Gregg Neck Park, recorded among the Land Records for Kent County.

SAVING AND EXCEPTING therefrom the 40–foot wide road within this area which by deed dated the 6th day of July, 1950, and recorded among the Land Records for Kent County ... was granted and conveyed unto the County Commissioners of Kent County.

*TOGETHER with the plaza areas, approaches to navigable waters at the road ends, and the beach area and riparian rights connected therewith.*

BEING a part of the same real estate which by deed dated the 9th day of November, 1946, and recorded among the Land Records for Kent County aforesaid in Liber R.A.S. No. 41, folio 394, was granted and conveyed unto the said J. Early Wood and Mary E. Wood, his wife, by Sara C. Plummer et al.

(Emphasis added).

At the hearing, the parties introduced minutes of various meetings held over the years by the County Commissioners, at which the pier was discussed. According to the Minutes of March 2, 1971, the County discussed ownership of both the landing and the pier on that date. As a result, the County wrote to Wilgus, as President of GNYC, and requested a copy of GNYC's application to the Army Corps of Engineers and the permit issued to GNYC. The Minutes of the County Commissioners of March 23, 1971, reveal that the Association asked the County to close "about 200′ to the end of the road." The County took the matter "under advisement," however, "until the matter could be cleared up concerning permit and ownership of the pier at the end of the [C]ounty road."

The Minutes of the County Commissioners dated September 11, 1973, reflect that the issue of ownership of the road and the pier was considered by the County on that date. Three people appeared before the County Commissioners with regard to the 1950 conveyance: State Senator Elroy Boyer; Phillip Skipp, the attorney for Wood who had prepared the 1950 Deed; and a person identified as Mrs. Levis. Boyer asked the County to sign a quit claim deed so that the Association could "control the area from the end of the road to the waters [sic] edge." Significantly, Skipp advised the Commissioners that "it was not the intent of Mr. Wood to convey this area to the County. . . ." The County never signed a quit claim deed, however.

According to the Minutes of the County Commissioners dated May 21, 1974, the Association and various residents of the area appeared in reference to a petition "to close the area at the end of Gregg Neck Road." Skipp advised that, with respect to the 1950 Deed, "it was Mr. Wood's intention to deed only the land for the road and not the riparian right at the end of the road."

Shortly thereafter, on September 13, 1974, Wood's widow executed a Confirmatory Deed, which was almost identical to the 1962 Deed. Its purpose was to correct the "vagueness" regarding the 1962 Deed, and to confirm the conveyance to the Association, including "approaches to navigable waters at the road ends, and the beach and riparian rights," exclusive of the right-of-way previously given to the County. It also provided that the conveyance to the Association was "in fee simple."

The Minutes of the Kent County Department of Public Works, dated November 5, 1985, indicate that Carter Stanton, the Department's Director, determined that "the pier existed before this area was established as a County landing in the 1950's." Although the County had a right-of-way to build the road, "the private pier owned by the Gregg Neck Boat Club is directly in front of the right-of-way." Thus, "[t]he Board requested that the Public Landings and Facilities Board make

recommendation [sic] for an amiable resolution for both owners of the pier and the general public wishing to use the County Ramp." [2]

Stanton advised the Board on November 3, 1985, that he "had no further recommendations to submit for resolving the problem with the County landing and the privately owned pier" in Gregg Neck Park. On December 3, 1985, Stanton again reiterated that the Board had no recommendations to submit for resolving the problem with "the County landing and the privately owned pier."

The Board's Minutes of April 8, 1996, indicate that Stanton appeared in response to a concern about the pier. At that time, he "advised that this pier is not on County property." As a result, the Board advised "that the County does not have anything to do with this issue." The Board's Minutes of May 13, 1996, indicate that the Commissioners "advised [Stanton] to write a letter to Mr. McCollum informing him that the County has nothing to do with the Gregg Neck [c]ommunity slips." Accordingly, by letter dated April 9, 1996, Stanton wrote to William McCollum and said, in part:

> Several weeks ago, I spoke to you on the telephone and explained the County's position on the pier near Gregg Neck public landing.
>
> In answer to your letter, I do not know who owns the pier or slips next to Gregg Neck public landing, only that *the County does not.* Not being familiar with the Community Association bylaws or the "Yacht Club" Bylaws, I do not know who controls the slips. I am also not aware of the rights property owners have to slips, this would be included in the deed or contract of sale . . .

---

**2.** Kent County Code (1994), § 68–3 establishes the Public Landings and Facilities Board (the "Board"), which has the "duty of regulating public landings, docks . . . and recommending rules and regulations." § 68–3(E). Kent County Code § 68–5 sets out that the "proceedings for the establishment, making, altering or closing and regulating the use of any public landings in Kent County shall be in all respects the same as prescribed by the laws of this state for opening, altering or closing roads and for the use of roads."

I do not intend to seem short, however the *County has never been involved with the pier* next to Gregg Neck Public Landing.

(Emphasis added.)

Stanton's testimony at the hearing was consistent with the information recounted from the various minutes. He opined that the pier belonged to GNYC. The following testimony is relevant:

[APPELLANT'S ATTORNEY]: ... [Y]ou are aware there's a pier out at Gregg Neck Landing, correct?

[STANTON]: Yes, sir.

[APPELLANT'S ATTORNEY]: What is your understanding as to who owns that pier?

[STANTON]: *It was always my understanding from the time I was employed with the County that it was not owned by the County.*

[APPELLANT'S ATTORNEY]: Who told you that?

[STANTON]: ... I guess the County Commissioners, originally, or the Director of Parks and Recreation at the time. I'm not sure who told me.

[APPELLANT'S ATTORNEY]: You don't know specifically what Commissioners told you that?

[STANTON]: No ...

[APPELLANT'S ATTORNEY]: And did you ever discuss the issue with the members of the Gregg Neck Yacht Club?

[STANTON]: The issue of that pier has come—people have called me—I have seen people when I was up there and have spoken to them. I don't know whether they are members of the Yacht Club or not. I assume they are from Gregg Neck or that area.

[APPELLANT'S ATTORNEY]: What did you tell them if they asked you about the pier?

[STANTON]: *I have always said that it wasn't the County's pier, that we had the ramp and that was the extent of it as far as I knew—the right of way and the ramp.*

\* \* \*

[APPELLANT'S ATTORNEY]: ... [D]id you ever tell anybody that the Gregg Neck Yacht Club, or Boat Club owned the pier?

[STANTON]: I—yes, I may have.

 \* \* \*

[APPELLANT'S ATTORNEY]: And so that anyone that asked you told them—if someone from the public asked generally *you would have told them it was not the County's property?*

[STANTON]: *That is correct. The pier.*

 \* \* \*

[APPELLANT'S ATTORNEY]: So back in 1985, at least, and maybe before that, you and the Public Landings were aware that—or were of the opinion and probably told people that Gregg Neck Boat Club, that I referred to as Gregg Neck Yacht Club owned that pier?

[STANTON]: Yes sir.

[APPELLANT'S ATTORNEY]: Is that correct? *Did you ever hear the Commissioners remark in open session that the pier was privately owned?*

[STANTON]: *I—maybe not privately owned, but that it wasn't theirs—I mean it wasn't the County's.*

[APPELLANT'S ATTORNEY]: *So in open session you recall hearing the Commissioners state that the pier was not the County's?*

[STANTON]: *Yes.*

(Emphasis added).

Donald Replogle, a former resident of Gregg Neck and former president of GNYC, testified that he acquired his residential property in 1958, and had a slip at the pier. He stated: "Well it was always my understanding that the Gregg Neck Yacht Club owned the pier." Further, he claimed that appellant maintained the pier at its expense. He recalled that, on behalf of GNYC, he had once asked the County to erect a security light at the end of Mill Road, near the landing and the pier, but was informed by Stanton that the County

denied the request because the light "would only benefit the members of the *private pier.*" (Emphasis added). Replogle also testified that at various times he and Stanton discussed the public landing and the pier, and that on every occasion Stanton indicated that the pier was private property.

Linda Watson purchased a home in Gregg Neck Park and joined GNYC in 1986. It was her understanding that the pier was privately owned, with signs to that effect posted on the pier. Watson testified that in 1988 or 1989, she and other members of GNYC attended a meeting of the County Commissioners in order to discuss the possibility of expanding GNYC's pier. During that meeting, Stanton represented that the pier belonged to GNYC.

Christine Gillan, who also had a slip at the pier, testified that the contract of sale for the purchase of her home provided for the sale of the house "[t]ogether with all rights or license the sellers have to their boat slip to the property." According to Gillan, the original owner of her home stated that "the slip goes with the house-that's the way it is and that's the way it's been for 40 years." Gillan estimated that she paid an additional $13,000 for her home because of the boat slip at the private pier. Further, she testified that she relied on information from the County to the effect that the pier does not belong to the County.

In the first of several oral rulings, the court found the 1950 Deed ambiguous with respect to the nature of the conveyance. The court recognized that the term "right-of-way" could either create an easement or a fee simple interest. The court also said: "I'm not exactly sure what [Wood's] intent was. He conveyed fee simple to the County, made no mention of riparian rights." Therefore, the court recognized that it had "to determine [Mr. Wood's] intent in 1950 . . . ," because the 1950 Deed "doesn't say whether [the conveyance of the 40 foot wide right-of-way] is fee simple. . . ." In resolving the ambiguity, the court considered it significant that Wood wanted "to get rid of the roads. He wants to get rid of the maintenance of the roads. . . ."

In its construction of the 1950 Deed, the court also relied on the 1961 and 1974 deeds, which conveyed to the Association, in fee simple, some 17.5 acres, exclusive of the 40 foot right-of-way that Wood conveyed to the County in 1950. Looking at all three deeds together, the court concluded that it was "even more clear" that the 1950 Deed conveyed a fee simple interest to the County, with riparian rights, although there was "neither reservation of, nor an express grant of riparian rights." Further, the court said:

> I'm not concerned about the term "right of way." I'm concerned with fee simple or easement, as to the degree of ownership. And [Wood] doesn't say it, and that subsequent deed, though, in 1962, whether he meant to or not, and maybe he didn't read it well, when he drafted it, the way it's written—it's clear from that and that's all we have to go on. Because he isn't here for testimony, but it's clear that he conveyed . . . the whole roadway. . . . My inclination is, from my understanding of property law, that once you grant, and it's in fee simple, you get the whole bundle of sticks that go with it. The whole bundle of property rights, as I say, that go along with it.

Two days later, after additional testimony that we previously summarized, the court resolved the remaining issues, stating:

> I have already found that the pier touches on property which had previously been granted to the County. . . .

> \* \* \*

> [T]here is nothing to indicate that the County Commissioners were aware of the construction of the pier until after it had been constructed. And, quite simply, for the next thirty-five to forty years, there was a situation where the County considered it a public landing, the ramp, the access from the road to the water to be public with a private pier leading therefrom. And it was somewhat acknowledged but, quite simply, it doesn't appear anyone knew quite what to do with it. It was somewhat benign and didn't cause anyone any trouble.

Over several sets of County Commissioners, this continued on.

\* \* \*

Now, as you go through several sets of commissioners, one thing is that the failure to act, realistically, by one set of commissioners on an issue does not bind future commissioners from taking action.

Now that the Court has determined that the property, the land belongs to the County, the pier in question and the slips extend from County property, the question is what should be the resolution.

I find that estoppel and waiver does not apply to the County Government in this situation.... I can not find that anyone acted to their detriment on any actions taken by the Commissioners, or by the County. So, consequently, I have a private structure built on County property. That can not continue. Therefore, I find that the pier in question is the property of the Kent County Commissioners. It would be under the direction of the Public Landings Commission....

To that extent, the pier ... is public....

Therefore, the court ruled that "[t]he pier, including the slips constructed by Gregg Neck Yacht Club, Inc. is the property of the County Commissioners of Kent County, Maryland." Nevertheless, the court ordered appellees to lease the slips to the members of GNYC who were occupying them.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

When, as here, an action is tried without a jury, we review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Rule 8–131; *see Gwynn v. Oursler,* 122 Md.App. 493, 502, 712 A.2d 1072, *cert. denied,* 351 Md. 662, 719 A.2d 1262 (1998); *see also Murphy v. 24th Street Cadillac Corp.,* 353 Md. 480, 497, 727 A.2d 915 (1999); *Inner-*

*bichler v. Innerbichler,* 132 Md.App. 207, 229, 752 A.2d 291, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000). The clearly erroneous standard requires an appellate court to " 'consider the evidence produced at trial in a light most favorable to the prevailing party.' " *Murphy,* 353 Md. at 497, 727 A.2d 915 (citation omitted). A trial court's findings are clearly erroneous when they are not supported by substantial evidence. *Id.*

 The clearly erroneous standard only applies to the lower court's findings of fact, however. *B & P Enter. v. Overland Equip. Co.,* 133 Md.App. 583, 602, 758 A.2d 1026 (2000); *Nationwide Ins. Cos. v. Rhodes,* 127 Md.App. 231, 235, 732 A.2d 388 (1999); *Piper v. Layman,* 125 Md.App. 745, 754, 726 A.2d 887 (1999). When we consider conclusions of law, our review is more expansive. *Narayen v. Bailey,* 130 Md. App. 458, 461–62, 747 A.2d 195 (2000). We do not accord any deference to "[p]ure conclusions of law." *Oliver v. Hays,* 121 Md.App. 292, 306, 708 A.2d 1140 (1998); *see B & P Enter.,* 133 Md.App. at 602, 758 A.2d 1026; *Porter v. Schaffer,* 126 Md. App. 237, 259, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999). Instead, we must determine whether the trial court was legally correct. *Andy's Ice Cream, Inc. v. City of Salisbury,* 125 Md.App. 125, 137, 724 A.2d 717, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999).

## II.

The parties dispute whether, in 1950, Wood conveyed an easement or a fee simple interest to the County in the 40 foot right-of-way, and whether the conveyance included riparian rights. Appellant contends that the trial court erred in concluding that Wood conveyed a fee simple interest to the County in the 40 foot right-of-way, which included riparian rights and now extends to the pier. Moreover, even if the grant, on its face, conveyed a fee simple interest and riparian rights, appellant asserts that the court erred by failing to apply the doctrine of equitable estoppel to bar the County's claim to the pier.

Appellant concedes that, generally, "a fee simple conveyance contains, among other things, a conveyance of riparian rights." But, GNYC argues that the conveyance of the right-of-way in the 1950 Deed amounted to an easement, and thus did not include riparian rights. Appellees counter that the 1950 Deed conveyed the land in fee simple, and therefore the County obtained riparian rights. Moreover, appellees argue that the County "was clearly acting in its governmental capacity in maintaining the premises and constructing a boat ramp thereon. The doctrine of estoppel or acquiescence does not work against a municipality." In appellees' view, it is of no moment that, for some 40 years, the County "elected to ignore" appellant's claim to the pier.

We begin our analysis with an overview of several legal concepts that are important to an understanding of this case and our resolution of it.

An easement is "a non[-]possessory interest in the real property of another." *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630 (1984); *see Kirby v. Hook*, 347 Md. 380, 392, 701 A.2d 397 (1997). It "can be created expressly or by implication." *Kirby*, 347 Md. at 392, 701 A.2d 397. An express easement by reservation arises when a property owner conveys part of his property to another, but includes language in the conveyance that creates a right to use some part of the transferred land as a right-of-way. *See Greenwalt v. McCardell*, 178 Md. 132, 136, 12 A.2d 522 (1940), *overruled on other grounds by Travelers Indem. Co. v. Nationwide Constr. Corp.*, 244 Md. 401, 224 A.2d 285 (1966); *Greif v. Teas*, 156 Md. 284, 300, 144 A. 231 (1929). "A private easement implies, as an essential quality thereof, two distinct tenements; namely, the dominant, to which the right belongs, and the servient, upon which the obligation rests." *Maryland & P.R. Co. v. Silver*, 110 Md. 510, 516, 73 A. 297 (1909); *see Board of County Comm'rs of Garrett County v. Bell Atlantic–Md., Inc.*, 346 Md. 160, 175, 695 A.2d 171 (1997). If land is burdened by an easement, the owner of the servient estate is not divested of ownership of the property. *Greenwalt*, 178 Md. at 136, 12

A.2d 522. Rather, the easement area remains the property of the owner of the servient estate. *Id.*

" 'A right of way is nothing more than a special and limited right of use; and every other right or benefit derivable from the land, not essentially injurious to, or incompatible with the peculiar use called the right of way, belongs as absolutely and entirely to the holder of the fee simple as if no such right of way existed.' " *Desch v. Knox,* 253 Md. 307, 311, 252 A.2d 815 (1969) (quoting *Public Service Comm'n v. Maryland Gas Transmission Corp.,* 162 Md. 298, 312, 159 A. 758 (1932)); *see Millson v. Laughlin,* 217 Md. 576, 585, 142 A.2d 810 (1958) ("[T]he owner of the servient tenement is entitled to use and enjoy his property to the fullest extent consistent with the reasonably necessary use thereof by his neighbor in accordance with the terms and conditions of the grant."). As the Court said in *Bishields v. Campbell,* 200 Md. 622, 624, 91 A.2d 922 (1952), "a right of way is merely a right of passage and the owner of the land is entitled to use it for any purpose that does not unreasonably interfere with the use of the easement."

In *Chevy Chase Land Co. v. United States,* 355 Md. 110, 124, 733 A.2d 1055 (answering certified question), *aff'd,* 230 F.3d 1375 (Fed.Cir.1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000), the Court recently said: "[I]t has generally been held by courts of this and other states that 'deeds which in the granting clause convey a "right of way" are held to convey an easement only.' " (Citation omitted). The property dispute in *Chevy Chase* concerned a "right of way" granted by deed in 1911 to a railroad, and later converted to a hiking and biking trail under the federal "Rails to Trails" Act. *Id.* at 117, 733 A.2d 1055. The Court construed the deed granting the conveyance. In the context of that issue, the Court said:

> The general rule that the terms "right-of-way" and "easement" are synonymous came about because the rule is consistent with the likely intent of the parties to a deed when the term "right-of-way" is used .... "The fact that the

word 'easement' was not used to designate the property interest passing is not of particular significance since use of the phrase 'right-of-way' is generally understood to mean that only an easement is being granted."

*Id.* at 126, 733 A.2d 1055 (citations omitted).

The Court recognized that a deed conveying a right-of-way to a railroad could constitute an estate in fee simple. *Id.* at 128, 733 A.2d 1055. But, it added that "when a deed conveying a right-of-way fails to express a clear intent to convey a different interest in land, a presumption arises that an easement was intended." *Id.*

 Common law dedications are "voluntary offers to dedicate land to public use, and the subsequent acceptance, in an appropriate fashion, by a public entity." *City of Annapolis v. Waterman,* 357 Md. 484, 503, 745 A.2d 1000 (2000). Ordinarily, the fee owner of land conveys an interest in the land " 'to the public; usually to the local government having jurisdiction over the land.' " *Id.* at 506, 745 A.2d 1000 (quoting Urban Planning and Land Development Control Law § 140, at 259 (1975)). The owner retains a fee simple interest in the dedicated parcel, "subject to an easement for the public." *Maryland–National Capital Park and Planning Comm'n v. McCaw,* 246 Md. 662, 675, 229 A.2d 584 (1967); *see Perellis v. City of Baltimore,* 190 Md. 86, 92, 57 A.2d 341 (1948); *Slear v. Jankiewicz,* 189 Md. 18, 26, 54 A.2d 137 (1947), *cert. denied,* 333 U.S. 827, 68 S.Ct. 453, 92 L.Ed. 1112 (1948).

 A completed common law dedication "requires an offer and an acceptance." *Washington Land Co. v. Potomac Ridge Development,* 137 Md.App. 33, 40, 767 A.2d 891 (2001); *see Town of Glenarden v. Lewis,* 261 Md. 1, 3, 273 A.2d 140 (1971). Acceptance may occur when the "appropriate entity assum[es] control and maintenance of the property offered." *Waterman,* 357 Md. at 504, 745 A.2d 1000. Once an offer by a grantor is accepted by a competent government authority, "common-law dedication is complete." *Id.; see Mauck v. Bailey,* 247 Md. 434, 442–44, 231 A.2d 685 (1967). The accep-

tance requirement is important because it " 'protect[s] municipalities from having someone impose upon them the responsibility for maintenance or repair of streets or highways.' " *Waterman,* 357 Md. at 505, 745 A.2d 1000 (citation omitted).

Generally, an acceptance of an offer to dedicate is shown by one of four methods. *See Windsor Resort v. Ocean City,* 71 Md.App. 476, 486–87, 526 A.2d 102, *cert. denied,* 311 Md. 145, 532 A.2d 1371 (1987). These are: acceptance of a deed or other record; acts *in pais,* such as grading, at public expense; long use; or express statutory or other official action. *Washington Land Co.,* 137 Md.App. at 44, 767 A.2d 891; *see Farrell v. Phillips,* 94 Md.App. 152, 156, 616 A.2d 437 (1992) (Dedication may be shown " 'by deed or other record; by acts *in pais,* such as opening, grading or keeping the road in repair at the public expenses; or by long continued use[ ] on the part of the public.' " (quoting *City of Baltimore v. Broumel,* 86 Md. 153, 158, 37 A. 648 (1897))).

In a dispute about whether a dedication has occurred, the court must consider "declarations of the landowner, his intentions as manifested by his acts, and all the other circumstances of the case." *Smith v. Shiebeck,* 180 Md. 412, 420, 24 A.2d 795 (1942). The owner's intent "to give his lands over to public use" is critical. *Washington Land Co.,* 137 Md.App. at 41, 767 A.2d 891; *see Blank v. Park Lane Center, Inc.,* 209 Md. 568, 574, 121 A.2d 846 (1956) ("The intention of the owner is the governing test."). Moreover, the "[e]xpression of that intent must be clear and unequivocal." *Washington Land Co.,* 137 Md.App. at 41, 767 A.2d 891; *see Department of Natural Resources v. Ocean City,* 274 Md. 1, 8, 332 A.2d 630 (1975). Similarly, "the public must also show its intent to accept clearly and decisively." *Washington Land Co.,* 137 Md.App. at 41, 767 A.2d 891; *see North Beach v. North Chesapeake Beach Land & Improvement Co.,* 172 Md. 101, 116, 191 A. 71 (1937).

It is noteworthy that " 'a conveyance creates a 'dedication' only when the conveyance benefits the public at large and not merely a portion of it, such as the property owners

within a particular subdivision.' " *Waterman,* 357 Md. at 506, 745 A.2d 1000 (quoting *River Birch Assoc. v. City of Raleigh,* 326 N.C. 100, 388 S.E.2d 538, 542 (1990)); *see Chapman v. Rogan,* 222 Md. 12, 19, 158 A.2d 626 (1960); *Brady v. Farley,* 193 Md. 255, 259, 66 A.2d 474 (1949). In effect, the " 'public must be a party to every dedication [because] the essence of a dedication to public uses is that it shall be for the use of the public at large.' " *Waterman,* 357 Md. at 506, 745 A.2d 1000 (quoting *River Birch,* 388 S.E.2d at 542).

 Once property has been dedicated, it "cannot later be acquired by adverse possession." *Farrell,* 94 Md.App. at 156, 616 A.2d 437; *see City of Baltimore v. Chesapeake Marine Ry. Co.,* 233 Md. 559, 572, 197 A.2d 821 (1964), *overruled, in part, on other grounds by Travelers, supra,* 244 Md. at 414–16, 224 A.2d 285. On the other hand, "Where the public has never accepted the offer of dedication ... the property is subject to adverse possession." *Farrell,* 94 Md. App. at 156, 616 A.2d 437. The *Farrell* Court explained, 94 Md.App. at 156, 616 A.2d 437:

> The reason is that the dedication is not complete and the original dedicator or his successors in interest may revoke or modify the offer to dedicate, in whole or in part, until there is an acceptance. Adverse possession of property offered but not accepted for public use forecloses the right, title and interest of the original dedicator with respect to the property offered to the public and revokes the offer to dedicate.

 Riparian rights are also pertinent here. "Generally, a riparian landowner is 'defined as one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water....' " *Kirby v. Hook, supra,* 347 Md. at 389, 701 A.2d 397 (citation omitted); *see Kelly v. Nagle,* 150 Md. 125, 137, 132 A. 587 (1926); *Gwynn v. Oursler,* 122 Md.App. at 497, 712 A.2d 1072. Maryland Code (1982, 1996 Repl.Vol.), § 16–103 of the Environment Article ("E.A."), provides that a "riparian owner may not be deprived of any right, privilege, or enjoyment of riparian

ownership. . . ." Further, E.A. § 16–201 provides: "A person who is the owner of land bounding on navigable water is entitled to any natural accretion to the person's land. . . . After an improvement has been constructed, the improvement is the property of the owner of the land to which the improvement is attached."

Maryland Code (1957, 1998 Repl.Vol.), Art. 25, § 156, states:

### § 156. Authority to establish.

In all cases where the public convenience requires it, the county commissioners shall have the power to establish a public landing upon any navigable river, canal, bay, sound or other navigable waters.

The County established a public landing at the end of Mill Road. Public landings are established for the benefit of the public, so that "the transit of travelers and the use of the landing in any lawful way must be reasonably expeditious and consistent with its successive and reasonable enjoyment in common by all the public, whose convenience and necessity are of paramount consideration." *Maxa v. County Comm'rs*, 158 Md. 229, 231, 148 A. 214 (1930). Moreover, this important public right may be enforced by the State pursuant to Md. Code (1957, 1996 Repl.Vol.), Art. 27, § 484. It states, in relevant part:

### § 484. Damaging or interfering with use of public wharf or landing.

Any person, partnership or corporation who shall interfere with the use of a public landing, or do anything to destroy its usefulness to the public, or who shall destroy or damage any wharf or other structure erected on said wharf . . . shall be guilty of a misdemeanor upon conviction thereof shall be subject to a fine of not less than $25.00.

No evidence was presented, however, that GNYC's pier interfered with the County's right to maintain and control the public landing.

## III.

As we previously observed, the 1950 Deed conveyed a "right of way" to the County for the purpose of the "extension, construction, improvement and maintenance of the ... County road," along with the right to "use and maintain such pipes, culverts and drainage structure" and to "maintain the right of way, and/or adjacent land, at the grades of said road." The question is whether the right-of-way amounted to an easement or a fee simple interest. Ordinarily, the construction of a deed is a question of law for the court, and is subject to *de novo* review. *Chevy Chase*, 355 Md. at 123, 733 A.2d 1055; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999); *Calomiris v. Woods*, 353 Md. 425, 434, 727 A.2d 358 (1999); *see also Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298 (1996). To ascertain the nature of the property interest conveyed to the County, we must first look to the language of the 1950 Deed. In construing the language of a deed, the basic principles of contract interpretation apply. *Chevy Chase*, 355 Md. at 123, 733 A.2d 1055; see *Brown v. Whitefield*, 225 Md. 220, 225, 169 A.2d 920 (1961); *Buckler v. Davis Sand & Gravel Corp.*, 221 Md. 532, 537, 158 A.2d 319 (1960). "These principles require consideration of ' "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." ' " *Chevy Chase*, 355 Md. at 123, 733 A.2d 1055 (citations omitted).

In addition, the court is supposed to give effect to the intention of the parties, gleaned from the text of the entire instrument, unless that would violate a principle of law. *Chevy Chase*, 355 Md. at 123, 733 A.2d 1055; *see Delphey v. Savage*, 227 Md. 373, 378, 177 A.2d 249 (1962); *Gwynn*, 122 Md.App. at 500, 712 A.2d 1072. Moreover, in "interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern without the assistance of extrinsic evidence." *Drolsum v. Horne*, 114 Md.App. 704, 709, 691 A.2d 742, *cert. denied*, 346 Md. 239, 695 A.2d 1227 (1997). We also consider the language of the deed

"in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance." *Chevy Chase,* 355 Md. at 123, 733 A.2d 1055.

In 4 Herbert T. Tiffany, *The Law of Real Property* § 981 at 112 (3d ed.1975, 1985 Cum.Supp.), it states:

> Thus the intention of a grantor is to be determined from the four corners of his deed, if possible, and if from an attempt to make such determination an irreconcilable conflict arises because of contradictions within the deed other means must be employed to ascertain the correct interpretation to be placed upon it. Words used in a deed should be construed in pari materia and a construction should be adopted which will give effect to all words. Each word and provision of the instrument should be given that significance which is consistent with, and will effectuate, the intention of the parties.

Language is ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris,* 353 Md. at 436, 727 A.2d 358; *see Ashton,* 354 Md. at 340, 731 A.2d 441. The determination of ambiguity is a question of law, subject to *de novo* review. *See Ashton,* 354 Md. at 341, 731 A.2d 441; *Calomiris,* 353 Md. at 434, 727 A.2d 358. When the words in a deed " 'are susceptible of more than one construction,' " the deed is " 'construed against the grantor and in favor of the grantee....' " *Morrison v. Brashear,* 38 Md.App. 693, 698, 382 A.2d 353 (1978) (citation omitted).

Maryland Code (1939), Art. 21, § 12, which was in effect at the time of the conveyance, is relevant.[3] It stated:

> No words of inheritance shall be necessary to create an estate in fee simple, but every conveyance of real estate shall be construed to pass a fee simple estate, unless a contrary intention shall appear by express terms or be necessarily implied therein.

---

**3.** This provision is comparable to Md.Code (1974, 1996 Repl.Vol.), § 4–105 of the Real Property Article ("R.P.").

Maryland Code (1939), Art. 21, § 13, which was also in effect at the time of the conveyance, is also relevant.[4] It provided:

The word "grant," the phrase "bargain and sell," in a deed, or any other words purporting to transfer the whole estate of the grantor shall be construed to pass to the grantee the whole interest and estate of the grantor in the lands therein mentioned, unless there be limitations or reservations showing, by implication or otherwise, a different intent.

▉▉ To support its claim that Wood merely gave an easement to the County, appellant observes that when Wood wanted to convey a fee simple estate, as opposed to an easement, it was expressly stated in the language of the document. GNYC states: "The inference as to the intent of the 1950 deed is inescapable: That the grant of a right-of-way to the County was an easement for the specified purpose of a road, nothing more." Further, appellant argues:

[O]nly one of two conclusions can be reached: 1) That the conveyance to the County was an easement and, therefore, did not include the area beyond the end of the road or riparian rights; OR, in spite [of] the considerable evidence that supports the above conclusion, 2) That the conveyance was a fee simple estate, but did not include the area beyond the end of the road or riparian rights. In either event, the trial Court erred in holding that the conveyance was in fee simple and/or included the area beyond the end of the road and riparian rights, thereby permitting the County's action with regard to the GNYC pier and should be reversed.

Looking at the 1950 Deed as a whole, and applying the principles outlined above, we are persuaded that the court erred in concluding that Wood conveyed a fee simple interest to the County in the right-of-way. The Deed conveyed a right-of-way for a specified use; that term, and the context in

---

4. This provision is now found in Md.Code (1996 Repl.Vol.), R.P. § 2–101.

which it was used, are consistent with the conveyance of an easement. *See Chevy Chase,* 355 Md. at 124–126, 733 A.2d 1055; *Desch,* 253 Md. at 311, 252 A.2d 815; *Hodges v. Owings,* 178 Md. 300, 305, 13 A.2d 338 (1940); *Public Serv. Comm.,* 162 Md. at 312, 159 A. 758. As we noted earlier, the terms "easement" and "right-of-way" are generally considered "synonymous." *Chevy Chase,* 355 Md. at 126, 733 A.2d 1055. Moreover, the 1950 Deed omitted any mention of the term "fee simple" or riparian rights. Although those omissions are not dispositive, they are certainly noteworthy, particularly when we compare the 1950 Deed to the later deeds.

■ To the extent that the 1950 Deed is ambiguous, our view is strengthened by the parol evidence presented at trial, which was reviewed in evidence without objection. Even if the deed is not ambiguous, however, the parol evidence may be considered. This is because "[i]t is a well recognized principle that, as a general matter, the admissibility of evidence admitted without objection cannot be reviewed on appeal." *Hall v. State,* 119 Md.App. 377, 389, 705 A.2d 50 (1998); *see Nelson v. State,* 137 Md.App. 402, 423–24, 768 A.2d 738 (2001). The parol evidence supports our construction of the 1950 Deed.

The extrinsic evidence irrefutably established that the grantor only intended to convey an easement for a specific use; Wood did not intend to convey a fee simple estate to the County. Significantly, Skipp, Wood's lawyer who drafted the 1950 Deed, addressed the County Commissioners on two occasions. Each time, he specifically advised that Wood did not intend to convey riparian rights to the County, and only intended to convey the land needed to construct the road, not the area beyond the end of the road. Skipp's statements are also consistent with the language in Wood's 1962 Deed, which conveyed 17.5 acres to the Association. Moreover, the road itself ends short of the water, and riparian rights were not needed to construct or maintain the roadway. Additionally, both the 1962 Deed and the 1974 Confirmatory Deed included provisions that are conspicuously absent from the 1950 Deed.

The 1962 and 1974 deeds expressly conveyed the approaches to navigable waters at the road ends, the beach areas, and *riparian rights*. Moreover, they also expressly stated that the conveyance to the Association was in fee simple. If, in 1950, Wood intended to convey a fee simple interest to the County, with riparian rights, it is likely that he would have said so. Further, he would not have later conveyed to the Association the "approaches to navigable waters" or riparian rights.

In reaching our conclusion, *Chevy Chase*, 355 Md. 110, 733 A.2d 1055, is helpful. There, the Court concluded that the 1911 deed granting a right-of-way to the railroad conveyed only an easement. *Id.* at 118, 733 A.2d 1055. The Court reasoned:

> The use of the 'right-of-way' language provides a strong indication that the parties intended to convey an easement as opposed to an estate in fee simple absolute. We find nothing in the deed to indicate that anything more than a right of passage was intended, particularly in light of the deed's separate grant 'in fee simple' of other land.... Our conclusion is confirmed by the circumstances of the conveyance, including the 20 year existence of the railway....

*Id.* Even if the conveyance constituted the grant of a fee simple interest, the outcome would not change. We explain.

## IV.

Regardless of whether the County obtained a fee simple interest in the land that is now Mill Road, appellees argue that the 1950 conveyance constituted a dedicated street that extended into the waters of Mill Creek, and thus, by implication, included riparian rights. Therefore, appellees claim the right to the pier. They point to the testimony of the surveyor, who said the description of the conveyance fell within the waters of Mill Creek, and the plats prepared for the subdivision at its inception, which showed that the road extended to the waters of Mill Creek. Further, appellees contend that a dedicated road that runs to a body of water necessarily includes the right to build a wharf or pier at its end. Additionally, they

assert that, as a municipality, the County had the right to control the area in issue. Appellant counters that, in the circumstances of this case, the grant of the easement did not include riparian rights or the right to construct a pier.

The court acknowledged that the 1950 Deed did not "mention the River, or Creek". The court also found one or two mistakes "of the calls." But, the court determined that the conveyance "went into the creek by the way it's described. . . . It goes right to the River and ceases."

As we observed, a riparian owner is "one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water such as a river, bay, or running stream." *Gwynn v. Oursler, supra*, 122 Md.App. at 497, 712 A.2d 1072; *see Kirby*, 347 Md. at 389, 701 A.2d 397; *Becker v. Litty*, 318 Md. 76, 82, 566 A.2d 1101 (1989); *Owen v. Hubbard*, 260 Md. 146, 155, 271 A.2d 672 (1970). A fundamental aspect of riparian rights is access to water. *Becker*, 318 Md. at 82, 566 A.2d 1101; *People's Counsel for Baltimore County v. Maryland Marine Mfg. Co., Inc.*, 316 Md. 491, 501–02, 560 A.2d 32 (1989). Those who have riparian rights are entitled to construct "wharves, piers, and landings that are connected to the waterfront and built out into the water." *Gwynn*, 122 Md.App. at 497–98, 712 A.2d 1072; *see Holiday Point Marina Partners v. Anne Arundel County*, 349 Md. 190, 206, 707 A.2d 829 (1998)(stating that the County had the authority to regulate through zoning " 'the exercise of the riparian right to wharf out because, under law dating back for more than 200 years, this right, when exercised, is nothing more than an extension of the shore land.' " (citations omitted)).

*Gwynn v. Oursler, supra*, 122 Md.App. 493, 712 A.2d 1072, which involved a dispute concerning the scope of an easement, riparian rights, and the right to build a dock, is instructive here. In that case, we considered whether a right-of-way extending to a body of water included, by implication, riparian rights as well as the right to erect a pier.

In *Gwynn*, two families who owned adjoining parcels of waterfront property quarreled over whether the appellants

"had a riparian right-of-way . . . across the land of appellees," *id.* at 495, 712 A.2d 1072, which "was intended to give them access to a dock" on the Patuxent River. *Id.* at 497, 712 A.2d 1072. The deed in issue was silent as to piers, nor did it mention riparian rights. It did provide, however, that it was "for ingress and egress only." *Id.* at 496, 712 A.2d 1072. At the time of the deed, a pier was located at the end of the right-of-way. After it was destroyed by hurricane, however, it was rebuilt at another location, and was no longer situated at the end of the right-of-way.

The Court concluded that an easement across two water-front parcels does not, as a matter of law, include riparian rights that would entitle appellants to construct, use, and maintain a pier at its end. Thus, we agreed with the trial court that a "right-of-way to the shore of a navigable river does not, by implication, create riparian rights." *Id.* at 495, 712 A.2d 1072. Relying on decisions from other jurisdictions, we also said that, generally, a deed granting a "right-of-way to a body of water, alone, does not entitle the grantee [to] the right to construct a dock or a pier." *Id.* at 500, 712 A.2d 1072.

In *Gwynn*, we emphasized the importance of ascertaining the grantor's intent, based on the language used for the conveyance. We said:

> [O]nce a court is faced with a deed granting a right-of-way to a body of water, the court must undertake a two-part analysis to determine whether the grantor intended to allow the grantee the right to construct a pier or dock. First, the court must examine the deed alone to determine whether, on its face, it grants or denies the riparian rights. If the deed itself contains an express grant or denial of that intent, the language of the deed controls. If, however, the deed is ambiguous as to the intent of the grantor, the court must undertake the second part of the analysis and may consider parol or other extrinsic evidence to discover the grantor's intent.

*Id.* (internal citations omitted).

For the reasons articulated earlier, we are satisfied from the 1950 Deed, on its face and as supplemented by the parol

evidence, that Wood's conveyance of a right-of-way to the County did not include riparian rights. Nevertheless, relying on *McMurray v. City of Baltimore,* 54 Md. 103 (1880), appellees claim that, even if the grant did not expressly or impliedly convey riparian rights, the County acquired such rights because of its municipal status.

In *McMurray,* the Mayor and City Council approved funds to construct a "public pier or wharf" at the end of Cross Street in Baltimore. *Id.* at 104. The City's right to construct the pier was contested by the fee owner of a lot in Baltimore "abutting on the south side of Cross Street, and extending eastwardly to the water of the basin or harbor." *Id.* In its analysis, the Court of Appeals reviewed the history of wharves in the City, the City Charter, and several ordinances that consistently approved the erection of wharves by the City at the end of public streets. The Court reasoned that, "[i]n a city situated on navigable water, nothing is of more importance than the privilege of constructing wharves or piers for the benefit and promotion of commerce." *Id.* at 110. It concluded that "[t]he dedication of [a] street to the public use as a street extending to the water, carried with it, by necessary implication, the right in the city to extend it into the harbor by the construction of a wharf at the end thereof." *Id.* at 112.

Other jurisdictions have relied on *McMurray.* *See, e.g., Chlopeck Fish Co. v. City of Seattle,* 64 Wash. 315, 117 P. 232, 237 (1911); *Backus v. City of Detroit,* 49 Mich. 110, 13 N.W. 380, 384 (1882). In *Chlopeck,* 117 P. at 237, the Supreme Court of Washington cited *McMurray.* There, appellants sought to prevent the construction of a gridiron wharf by the City of Seattle. The city plat identified the area where the wharf was to be constructed as a "city slip." The words "city slip" were also placed with the words "Vine Street". The court stated:

> "Where *streets terminating or fronting on navigable waters* have been established, whether by condemnation or dedication, and whether the fee is in the municipality or in the adjoining proprietor, the municipality, under legislative au-

thority to establish and regulate wharves, may cause public wharves to be constructed at the ends or in front of such streets and receive the wharfage from the same; and this is no invasion of the rights of the owner of private property abutting on such streets, *or of the rights of the adjoining riparian proprietor.*"

*Id.* at 237–38 (citations omitted)(emphasis added).

Subsequent case law in Maryland has also referred to the rule in *McMurray*. In *Owen v. Hubbard, supra,* 260 Md. 146, 271 A.2d 672, the Court acknowledged the rule in *McMurray,* stating that it "decided the city's right to construct a wharf at the end of a dedicated public street although the adjoining owner might still retain the underlying fee." *Id.* at 157, 271 A.2d 672.

At oral argument, appellant sought to distinguish *McMurray*. GNYC argued that the holding in *McMurray* was based on the fact that the pier was located in Baltimore, rather than a rural area or a suburb. We need not resolve whether that is an appropriate basis to distinguish *McMurray* because, even if the 1950 Deed constituted a dedication, or conveyed a fee simple interest or riparian rights, principles of non-acceptance, abandonment, and equitable estoppel are controlling. We turn to consider these issues.

## V.

Appellant argues that the trial court erred in failing to determine that the County acquiesced to appellant's ownership, abandoned any property rights that it may have had, and is barred by equitable estoppel from asserting an interest in the pier. Appellees argue, *inter alia,* that "the road in question has been dedicated." As appellant correctly points out, until October 1999, the County never claimed ownership of the pier built forty years earlier. To the contrary, the County indicated on several occasions that it did not own the pier, acknowledged that GNYC was the owner, and collected taxes from GNYC.

■ The 1950 Deed made clear that the right-of-way was for the benefit of "the general public," as well as the "adjoining property owners." If the conveyance constituted a dedication, we indicated earlier that a dedication must be accepted in order to be complete. Although appellees certainly accepted the land on which to construct the road, no evidence was presented that the County accepted riparian rights.

*Mauck v. Bailey, supra,* 247 Md. 434, 231 A.2d 685, is useful in our analysis. There, streets were dedicated for public use by an owner of land. The appellee's home, however, extended approximately twenty-five feet into the dedicated right of way, and appellee maintained her residence at that location for over twenty years, making improvements to it. The Court recognized that where an offer to dedicate has been accepted by the public, "the dedicated property cannot be subsequently acquired by adverse possession." *Id.* at 443, 231 A.2d 685. The Court noted, however, that in the case of a common law dedication, "where the public has never accepted the offer of dedication . . . the public acquires no rights and undertakes no duties in the property offered for public use until a valid acceptance has been made." *Id.* Because the appellee had maintained "unequivocal ownership" of that location for more than the prescriptive period of twenty years, the Court determined that her adverse possession "operated both to foreclose the right, title and interest of the original dedicator with respect to the right-of-way and to revoke the offer to dedicate that easement to the use of the general public." *Id.* at 444, 231 A.2d 685.

Our decision in *Farrell v. Phillips, supra,* 94 Md.App. 152, 616 A.2d 437, also provides guidance. There, appellees were the owners of two parcels acquired in 1975. They brought an action to quiet title to an unopened portion of a dedicated street that separated the two lots. They had built a house on one lot, and treated the disputed area between the lots as part of their lawn. For forty-five years, they enjoyed the entire property without any objection from the Town. When the Town requested an easement for a water line in the section separating the two parcels, the owners refused.

On appeal, the parties agreed that there was an implied offer to dedicate the streets to the public. Nevertheless, we determined that the Town had not accepted the dedication with respect to that portion used by the appellees. *Id.* at 157–58, 616 A.2d 437. Moreover, we noted that if the public does not accept an offer of dedication, "the property is subject to adverse possession." *Id.* at 156, 616 A.2d 437. We explained that "[a]dverse possession of property offered but not accepted for public use forecloses the right, title, and interest of the original dedication with respect to the property offered to the public and revokes the offer to dedicate." *Id.*

In our view, the Town's "actions belie[d] its contention that there was an acceptance of the entire street." *Id.* at 157, 616 A.2d 437. For forty-five years, "no one, other than the [appellees], had any interest in the unopened street. No one else used it." *Id.* at 158, 616 A.2d 437. Nor was it of any consequence that the owners had possession of the property with the Town's knowledge and permission. *Id.* We concluded that the trial court was not clearly erroneous in finding that the appellees acquired title to the property by adverse possession, based on their unequivocal, open, and exclusive use of the entire property for forty-five years. *Id.* at 159, 616 A.2d 437.

We conclude that, even if Wood's conveyance was a dedication that initially included riparian rights, the County did not accept the riparian rights. Alternatively, we are satisfied that the County abandoned its interest in riparian rights, and is equitably estopped from asserting ownership of the pier. Again, we explain.

Appellees maintain that the County, acting in its governmental capacity, may not be divested of its municipal right to assert ownership of the pier. Appellees rely on the principle that property held in a governmental capacity is impressed with a public trust and cannot be disposed of without special statutory authority from the legislature. *See Siejack v. City of Baltimore,* 270 Md. 640, 645, 313 A.2d 843 (1974); *Chesapeake Marine Railway,* 233 Md. at 572, 197 A.2d 821; *Maxa,* 158 Md. at 232, 148 A. 214; *Worcester Elec. Co. v. Hancock,*

151 Md. 670, 677, 135 A. 832 (1927). In *Chesapeake Marine Railway*, 233 Md. at 572, 197 A.2d 821, the Court said:

It is firmly established that the land held by a municipality in its governmental capacity ... and therefore held in trust for the public cannot be disposed of without special statutory authority and may not be acquired privately by adverse possession, which does not run against the sovereign.

To support their contention that the County was acting in its governmental capacity in connection with the land and pier, and not in proprietary capacity, appellees rely on *Town of Brunswick v. Hyatt*, 91 Md.App. 555, 605 A.2d 620 (1992). In discussing the difference between a governmental function and a proprietary function, the Court said:

"Where the act in question is sanctioned by legislative authority, is solely for the public benefit, *with no profit or emolument inuring to the municipality,* and tends to benefit the public health and promote the welfare of the whole public and has in it no element of private interest it is governmental in its nature."

*Id.* at 559, 605 A.2d 620 (quoting *Mayor of Baltimore v. State ex rel. Blueford,* 173 Md. 267, 276, 195 A. 571 (1937)); *see Anne Arundel County v. McCormick,* 323 Md. 688, 696, 594 A.2d 1138 (1991) ("[A]nother way of expressing the test is 'whether the act performed is for the common good of all or for the special benefit or profit of the corporate entity.' " (citation omitted)).

In *Desch v. Knox, supra,* 253 Md. at 312, 252 A.2d 815, the Court also recognized that property held by a municipality for a public purpose cannot be acquired by adverse possession. The Court said:

[N]obody can acquire any title by adverse possession of property which the county holds for public purposes. It is firmly established in Maryland that land held by a municipality in its governmental capacity may not be acquired privately by adverse possession.

Nevertheless, the principle articulated in *Desch* and other cases does not preclude a County from abandoning its right to

certain property. In *Chesapeake Marine Railway*, 233 Md. at 572, 197 A.2d 821, the Court stated:

In exceptional cases, where the Court found that right and justice demanded it, there has been recognition in Maryland that private ownership has been acquired of property held by a municipality in a governmental capacity (and so in trust for the public) where there has been *actual and notorious abandonment* of the property by the municipality for at least as long as the legal period of prescription which has induced action by the person claiming ownership, the result of which it would be unjust and inequitable to disturb.

(Emphasis added); *see also Messersmith v. Council of Riverdale*, 223 Md. 323, 326–27, 164 A.2d 523 (1960)(acknowledging that city's "title to property cannot be lost without an intention to abandon it, and mere non-user, even though it be long-continued, is not enough in and of itself to establish an abandonment[;] affirmative or straightforward act[s are needed] to indicate an intention to abandon").

The case of *United Finance Corp. v. Royal Realty Corp.*, 172 Md. 138, 191 A. 81 (1937), establishes that a municipality may, by its conduct, be found to have abandoned property dedicated to public use. There, a realty company sought specific enforcement of a contract in which a finance corporation agreed to sell lots in Baltimore City. The finance corporation claimed that it could not convey marketable title to the land because a substantial portion was dedicated to public use as highways. The Court explained:

"An abandonment does not result from mere nonuser, after a dedication is complete, unless a statute so provides, or from misuser, or delay in its improvement and use, or by a mere temporary abandonment of such use. *To constitute abandonment some affirmative act is essential.* On the other hand, if the nonuser is accompanied by user by the dedicator or by third persons, inconsistent with the public use, the nonuser may show an abandonment. *And a municipality may relinquish its control over property dedicat-*

*ed to it for public use by an abandonment thereof, and this is so notwithstanding prescription does not run against a municipality as to land granted to it for the use of the public."*

*Id.* at 145, 191 A. 81 (quoting Eugene McQuillin, *Municipal Corporations,* § 1735(2d ed.))(emphasis added).

Generally, direct evidence of an intent to abandon rarely exists. Rather, "the question of abandonment hinges upon the manifestations (or lack thereof) of an intent to abandon, and 'the issue in most cases is reduced to the question of what factors or circumstances are sufficient to justify an inference that there existed an intent to abandon.' " *Chevy Chase,* 355 Md. at 159, 733 A.2d 1055 (citation omitted). Non-use alone does not amount to an intent to abandon, however. As the Court of Appeals stated in *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 581, 709 A.2d 749 (1998):

"Abandonment depends upon concurrence of two factors, (a) an intention to abandon and (b) some overt act or some failure to act, which carries the implication that the owner does not claim or retain any interest in the subject matter. Time is not an essential element, but may be evidence of intention to abandon and may be considered in connection with acts manifesting such an intention . . ."

(quoting *City of Baltimore v. Hettleman,* 183 Md. 204, 212, 37 A.2d 335 (1944)).

We turn to consider the law of equitable estoppel. Equitable estoppel is defined as follows:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from assenting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

*Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986) (citation omitted); *see Leonard v. Sav–A–Stop Services,* 289 Md. 204, 211, 424 A.2d 336 (1981); *Bayshore Industries, Inc. v. Ziats,* 232 Md. 167, 175, 192 A.2d 487 (1963).

 Three essential and related elements are generally necessary to establish equitable estoppel: 1) voluntary conduct or representation; 2) reliance; and 3) detriment. *Markov v. Markov,* 360 Md. 296, 307, 758 A.2d 75 (2000). "Clearly ... equitable estoppel requires that the voluntary conduct or representation constitute the source of the estopping party's detriment." *Knill,* 306 Md. at 535, 510 A.2d 546. Ultimately, "whether or not an estoppel exists is a question of fact to be determined in each case." *Travelers, supra,* 244 Md. at 414, 224 A.2d 285; *see Markov,* 360 Md. at 307, 758 A.2d 75; *Gould v. Transamerican Assoc.,* 224 Md. 285, 297, 167 A.2d 905 (1961); *Liberty Mutual Ins. Co. v. American Auto. Ins. Co.,* 220 Md. 497, 501, 154 A.2d 826 (1959); *Zimmerman v. Summers,* 24 Md.App. 100, 120, 330 A.2d 722 (1975).

 Generally, wrongful or unconscionable conduct, on which a party relies to his detriment, is an element in the application of equitable estoppel. *Knill,* 306 Md. at 534, 510 A.2d 546; *Liberty Mutual,* 220 Md. at 501, 154 A.2d 826. But, equitable estoppel may apply "even in the absence of any fraud or wrongful intent" to mislead, if "the actions or the inaction of the party estopped ... 'cause a prejudicial change in the conduct of the other'." *Zimmerman,* 24 Md.App. at 120–21, 330 A.2d 722 (citation omitted); *see Knill,* 306 Md. at 534, 510 A.2d 546. Relying on *Travelers,* 244 Md. 401, 224 A.2d 285, what the Court said in *Zimmerman,* 24 Md.App. at 123, 330 A.2d 722, is pertinent here: "[T]he rule now to be followed in Maryland is that equitable estoppel may be applied, not only when the conduct of the party to be estopped has been wrongful or unconscientious, and relied upon by the other party to his detriment, but also when the conduct, apart from i[t]s morality, has the effect of rendering it inequitable and unconscionable to allow the rights or claims to be asserted or enforced."

We recognize that equitable estoppel ordinarily does not apply against the State in regard to governmental functions. *See, e.g., ARA Health Servs., Inc. v. Department of Public Safety and Corr. Servs.*, 344 Md. 85, 96, 685 A.2d 435 (1996) (stating that "[o]rdinarily, the doctrine of estoppel does not apply against the State...."); *Marriott v. Cole*, 115 Md.App. 493, 508, 694 A.2d 123, cert. denied, 347 Md. 254, 700 A.2d 1215 (1997) (stating that the doctrine of estoppel "ordinarily does not apply against the State or its agencies with respect to governmental functions"). But, equitable estoppel is available as against a municipal corporation. *Inlet Assoc. v. Assateague House Condominium Ass'n*, 313 Md. 413, 435, 545 A.2d 1296 (1988). The County Commissioners function as a municipal corporation. *See* Md.Code (1957, 1998 Repl.Vol.), Art. 25, § 1; *County Comm'rs of Carroll County v. Gross*, 301 Md. 473, 476, 483 A.2d 755 (1984); *Neuenschwander v. Washington Suburban Sanitary Comm'n*, 187 Md. 67, 74, 48 A.2d 593 (1946); *Gordon v. Comm'rs of Montgomery County*, 164 Md. 210, 213, 164 A. 676 (1933).

In *Berwyn Heights v. Rogers*, 228 Md. 271, 279, 179 A.2d 712 (1962), the Court recognized that equitable estoppel applies "to municipal, as well as private, corporations and individuals." *See also City of Hagerstown v. Hagerstown Ry. Co.*, 123 Md. 183, 194–95, 91 A. 170 (1914). But, "[t]here is no settled rule in this country as to when, and under what circumstances, equitable estoppel is available against a municipal corporation." *Inlet Assoc.*, 313 Md. at 434, 545 A.2d 1296; *see Permanent Fin. Corp. v. Montgomery County*, 308 Md. 239, 247, 518 A.2d 123 (1986). In *Inlet Assoc.*, however, the Court acknowledged that "while municipal corporations are not exempt from application of equitable estoppel principles, 'in practice we have applied the doctrine more narrowly.' " *Inlet Assoc.*, 313 Md. at 435, 545 A.2d 1296; *see also Permanent Fin. Corp.*, 308 Md. at 249, 518 A.2d 123; *Levinson v. Montgomery County*, 95 Md.App. 307, 334, 620 A.2d 961, cert. denied, 331 Md. 197, 627 A.2d 539 (1993).

*City of Baltimore v. Canton Co. of Baltimore*, 124 Md. 620, 93 A. 144 (1915), is also instructive. There, a grantor dedicat-

ed a street to the City of Baltimore that the City attempted to accept sixty-seven years later. The street had never been publicly used. Indeed, it had been utilized as a private shipyard for twenty-two years and remained fenced in and idle for the next five years. Twelve years prior to trial it had been rejuvenated as a shipyard, and the last thirty-eight years, up to the date of appeal, the City assessed and collected taxes on the property. The City did not "at any time or in any manner attempt ... to exercise control over the property." *Id.* at 634, 93 A. 144. In its analysis, the Court stated that " '[t]he law as established in this state, and elsewhere is that the mere non-user of an easement for more than twenty[-]nine years will not afford a conclusive [sic] evidence of abandonment, but such non-user for a prescriptive period, united with an adverse use of the servient estate *inconsistent* with the existence of the easement will extinguish it.' " *Id.* at 632, 93 A. 144 (emphasis added). The Court thus determined that the City was estopped from asserting any right to the property. *Id.* at 619, 93 A. 144.

Nevertheless, equitable estoppel is not applicable when the limited authority of a public officer has been exceeded, or was unauthorized or wrongful. For example, in *Chesapeake Marine Railway*, 233 Md. at 580, 197 A.2d 821, the Court determined that the City had not abandoned its ownership interest in property that was acquired through an accepted dedication, merely because the City allowed the Railway to operate at that location for several years. Moreover, it said equitable estoppel must stem from the "acts or conduct of [the municipality's] officers, agents or official bodies who are acting within the scope of their authority." *Id.* In the Court's view, the Assistant City Solicitor involved in the matter lacked the power to "waive or dispose of municipal property rights or authorize abandonment of a street," and the Railway was "bound to know" that the Assistant City Solicitor did not possess such power. *Id.* Therefore, equitable estoppel was found inapplicable. *Id.* at 582, 197 A.2d 821.

Abandonment and equitable estoppel are related concepts in the context of a case such as this one. The Court explained in *United Finance Corp.*, 172 Md. at 147, 191 A. 81:

> *But whether the basis for the relief be called equitable estoppel, or abandonment and reverter, is a mere matter of terminology of little relative importance, except to the verbal precision.* For in any case it involves the principle that he who, having an easement of way whether public or private, *suffers his right to lie fallow and unused for a long period of time, and throughout the period suffers the owners of the servient tenement not only to use it as though no such right existed,* but actually *acquiesces in such use by taking taxes or other charges assessed against it or profits therefrom as though no such easement existed, or by permitting any uses of the land inconsistent with the easement, may be held to have sufficiently manifested such an intention of abandoning the right as will estop him from asserting it.*

(Emphasis added). Relying on principles of equitable estoppel, the Court concluded in *United Finance Corp.* that the municipality was barred from claiming ownership of the disputed property.

 Based on the foregoing, we are satisfied that, as a matter of fact and law, the principles of equitable estoppel and abandonment apply here with respect to the County's claim to the pier. Indeed, at oral argument, appellees conceded that "10 sets of County Commissioners have been dodging this for forty years." The County cannot change its mind in the forty-first year.

The evidence was uncontroverted that GNYC built the pier in late 1959 or early 1960. Although the trial court said that there was no indication that the County knew of the pier until after it was constructed, the County never argued a lack of knowledge. Even if the County did not know in advance of GNYC's plan to build the pier, it certainly knew of the pier once it was constructed. Thereafter, appellant demonstrated unequivocal acts of ownership for forty years, with the knowl-

edge and acquiescence of the County. Moreover, the question of ownership of the pier was raised with the County on numerous occasions; as early as 1971, the minutes reflect discussions by the County about ownership. Yet, until 1999, the County repeatedly disclaimed ownership of the pier. The County's silence for forty years was relied upon by GNYC, the residents, and GNYC's members. At the very least, GNYC made significant monetary expenditures to maintain the pier. Therefore, the trial court was clearly erroneous in finding that no one "acted to their detriment" because of the County's "actions."

We conclude that the County's actions regarding the pier established that the County either never accepted riparian rights or abandoned its riparian rights. Moreover, under the circumstances attendant here, appellees are equitably estopped from claiming ownership of the pier that GNYC constructed some forty years ago, and has since maintained.

**JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY REVERSED. COSTS TO BE PAID BY APPELLEES.**