982 A.2d 905

**OLDE SEVERNA PARK IMPROVEMENT ASSOCIATION INC.**

v.

**John BARRY et ux.**

**No. 1458 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

Oct. 29, 2009.

---

586

Steven P. Resnick, Annapolis, MD, for Appellant.

Anthony F. Christhilf, Annapolis, MD, for Appellee.

Panel: DAVIS, SALMON and JAMES R. EYLER, JJ.

DAVIS, Judge.

In 2003, John and Karen Barry, appellees/cross-appellants,[1] sought to construct a driveway to their .35 acre property (the Barry Parcel) in Severna Park, Maryland. Appellees proposed to construct the driveway over a swath of unimproved land (the Undeveloped Land) that abutted the western boundary of their property in order to reach an improved roadway on Park Drive (the Improved Roadway). Both the Undeveloped Land and the Improved Roadway are owned by Olde Severna Park Improvement Association, Inc. (OSPIA), appellant.

At a hearing on appellee's application for a variance on October 21, 2003, a representative of OSPIA opposed the application and, on August 22, 2007, OSPIA filed an Amended Complaint for Declaratory Judgment and Injunctive Relief in the Circuit Court for Anne Arundel County to preclude appellees from constructing their proposed driveway. OSPIA argued, *inter alia*, that the Undeveloped Land was not part of Park Drive and was actually an area of "Park" that it owned and which appellees had no right to use for the installation of a driveway. Appellees responded that Park Drive was comprised of both Undeveloped Land *and* the Improved Roadway and, thus, they had the right of use of the Undeveloped Land to install a driveway to link their property with the Improved Roadway.[2]

---

1. For purposes of this appeal, we shall refer to appellees/cross-appellants as "appellees."

2. Pursuant to Md.Code (2003 Repl.Vol., 2008 Cum.Supp.), Real Property (R.P.), § 2–114(a):

 Except as otherwise provided, any deed, will, or other instrument that grants land binding on any street or highway, or that includes any street or highway as 1 or more of the lines thereof, shall be construed to pass to the devisee, donee, or grantee all the right, title, and interest of the devisor, donor, or grantor (hereinafter referred to

On August 1, 2008, the circuit court issued a declaratory judgment, adjudging, *inter alia*, that the Undeveloped Land abutting the Barry Parcel was part of the "Park" and not Park Drive. Notwithstanding, the court established an easement by estoppel in favor of appellees over the Undeveloped Land to the Improved Roadway.

OSPIA filed the instant appeal, presenting two questions[3] for our review, which we have rephrased and consolidated as follows:

Did the circuit court err in concluding that appellees were entitled to an easement by estoppel?

Appellees filed a cross-appeal, presenting one question for our review, which we have rephrased as follows:

Did the circuit court err in determining that the Undeveloped Land is part of the recreational area known as the Park?

For the reasons that follow, we answer appellant's question in the affirmative and appellees' question in the affirmative. We shall affirm the judgment of the circuit court, affirming the court's ruling in favor of appellees, but on the basis rejected by the court.

## FACTUAL BACKGROUND

In 1990, appellees purchased 1.6 acres of improved real property in Severna Park, Maryland, identified as Lot "J" on

---

as the transferor) in the street or highway for that portion on which it binds.

3. The issues, consolidated above, as set forth by appellant, are:

 I. Did the trial court err in concluding that OSPIA's silence as to rights of record and its failure to protest the construction of other driveways could give rise to an estoppel, because the land records were so poorly drafted that [appellees] might have concluded that they enjoyed a right that they did not possess—the right to install their driveway through OSPIA's property?

 II. Did [appellees] meet their burden of proof in establishing an estoppel, where they failed to identify a single representation by OSPIA upon which they relied, and where they failed to conduct any inquiry as to whether they had a right to install their driveway through OSPIA's property?

a plat of Severna Park, defined in the land records of Anne Arundel County pursuant to a 1910 plat (the 1910 Plat). *See* Appendix 1.[4] The deed by which appellees purchased the property referenced an approximate 1.25 acre parcel and a .35 acre parcel of land.[5] Appellees resided in a house located on the 1.25 acre parcel and used both parcels as a single home site until 2002, after which they sold the 1.25 acre parcel and the house located thereon and retained the .35 acre site—the Barry Parcel—on which they wish to build a family home. During the twelve-year period when appellees resided on both parcels, appellees gained access to their home from Marlbrook Road, which abuts only the 1.25 acre parcel from the north. *See* Appendix 2.

Following the sale of the 1.25 acre parcel, appellees sought to build a driveway to access the Barry Parcel from the Improved Roadway. This required constructing the driveway over the Undeveloped Land that abutted the western boundary of the Barry Parcel, which appellees refer to in their brief as the "Park Drive Right–of–Way," pursuant to their argument, *infra,* that the Undeveloped Land was part of Park Drive and, thus, they had a right of way, or an easement,[6] to access the Improved Roadway. *See* R.P. § 2–114(a). The Barry Parcel abuts neighboring properties to the North and East. *See* Appendix 2. To the South, the Barry Parcel abuts property denoted as "Park" on the 1910 Plat. *Id.* OSPIA is the record owner of both the "Park" and Park Drive.

Because the Barry Parcel is characterized by steep slopes and located within Anne Arundel County's Critical Area,

---

**4.** We have included only the relevant portions of the referenced plats in our appendices.

**5.** The 1.6 acre parcel was separated by a deed dated April 29, 1959 and subsequently approved as a subdivision by Anne Arundel County on March 17, 1967.

**6.** [T]he terms "right-of-way" and "easement" are synonymous. *Gregg Neck Yacht Club, Inc. v. County Comm'rs of Kent County,* 137 Md.App. 732, 754–55, 769 A.2d 982 (2001) (citing *Chevy Chase Land Co. v. United States,* 355 Md. 110, 124, 733 A.2d 1055 (1999)).

appellees requested a variance to allow limited disturbance of those slopes. At the initial hearing before the Administrative Hearing Officer on October 21, 2003, a representative of OSPIA opposed the variance application.[7]

According to OSPIA, "under relevant deeds and the 1910 Plat, an area of 'Park' property which it owns, separates Park Drive from the Barry Parcel, and ... [appellees], therefore, have no right to install their proposed driveway through its Park property to provide access to their site." The 1910 Plat, referenced in the deed by which appellees obtained the property, denotes areas of "Park" and other areas enclosed within dash lines, some of which separate the Barry Parcel from the Improved Roadway. *See* Appendix 1.[8]

On February 22, 2007, OSPIA filed a Complaint for Declaratory Judgment and Mandamus and Certiorari and Injunctive Relief, which was amended by its First Amended Complaint for Declaratory Judgment and Injunctive Relief, filed on August 22, 2007. OSPIA's complaint alleged, *inter alia*, that the Barry Parcel did not abut Park Drive, but rather, abutted an area of "Park," which was a recreational amenity for the

---

**7.** Appellees summarize the ensuing motions and hearings that preceded OSPIA's complaint that is the subject matter of this appeal as follows:

The Hearing Officer approved the variance on November 21, 2003, but his decision was appealed by OSPIA and other property owners to the County Board of Appeals which denied the variance in an Opinion of August 25, 2005, in Case No. BA 130–03V. A Petition for Judicial Review of the Board's Decision was filed by [appellees] to the Circuit Court for Anne Arundel County in Case No. C05–108735, but subsequently withdrawn. [Appellees] next filed an application for a modified variance which was granted by the Administrative Hearing Officer on September 19, 2006, in Case No. 2006–023–V. That decision was also appealed by OSPIA to the Board of Appeals which granted the variance by Opinion of December 14, 2007, in Case No. BA 65–06 V. OSPIA then filed a Petition for Judicial Review of the Board's Decision in Case No. C–08–128617 in the circuit court, which affirmed the Board in an Opinion and Order of August 13, 2008. The circuit court's decision was appealed to this Court as Case No. 01708, September Term, 2008, but was dismissed by OSPIA on April 1, 2009.

**8.** Notably, the controlling deed described Lot J as *"near* the North side of Park Drive."

community through which appellees could not install their driveway. OSPIA sought to have the circuit court determine the rights of the parties under the various deeds and plats affecting the Barry Parcel and its Park and Park Drive properties.

Appellees controverted OSPIA's claims, arguing that the Undeveloped Land was not part of the "Park," but rather, was part of Park Drive and, therefore, provided them with access to the Improved Roadway. *See* R.P. § 2–114(a). Appellees further argued that, even if the Undeveloped Land was, in fact, part of the "Park," OSPIA was estopped from asserting its rights as owner of the contested area because other property owners had installed driveways through other areas of "Park" to reach Park Drive.

Following four days of trial, on August 1, 2008, the circuit court determined that the Barry Parcel abutted the Park, which was a "recreational area" to be used "in common by property owners within the subdivision as an amenity," explaining that Park Drive was at least thirty to fifty feet away from the western boundary of the Barry Parcel and that appellees enjoyed no rights of ownership in the abutting Park property or any other property interest in the contested area except "in common with all other property owners for use as a recreational area."

Notwithstanding, the court declared that OSPIA was precluded by the doctrine of equitable estoppel from enforcing its right as the owner of the property to prevent the construction of the driveway through it, because "at least three, perhaps five other property owners have constructed a driveway into the Park in the vicinity of the Barry [Parcel] for the purpose of connecting to Park Drive" and that it was informed of "no effort by [OSPIA] to preclude their use." The court noted that those driveways were within "plain sight" and

> built with [OSPIA's] permission or indifference or acquiescence or ignorance, but in any event that they have been there long enough, and are clearly known to [OSPIA] and

have been for some time, and we were informed of no effort by [OSPIA] to preclude their use.

Moreover, in taking no enforcement action against those owners, or by requiring them to obtain post-hoc permission ... we find that [OSPIA] has demonstrated a lack of diligence.

The court noted that "Dr. Barry indicated that for many years, he has seen those driveways from his vantage point on Lot J" and that he "relied upon the existence of those driveways and the lack of enforcement against them in his conclusion that he enjoyed a similar right." The court concluded that this "is the right he has attempted to exercise through the zoning process" and that, "[i]n so doing, he has incurred substantial attorney's fees and engineering expenses."

Finding that appellees had been "misled" by OSPIA, the court continued:

Because the land records that might have otherwise ... informed Dr. Barry of his right or lack thereof to construct this driveway were so poorly drafted, ambiguous and conflicted, we cannot conclude that he was attempting to exercise a right that those records would have informed him he did not enjoy.

Assuming for the moment that he or his attorney had inspected those records ... they might, those records, might or perhaps they did reasonably suggest ... that he could, in fact build into the driveway.

I find that those records, although we have declared to the contrary, after this litigation and four days of trial, have informed this Court, which will hold that there was no such right, we believe that a prior inspection of those records might have led Mr. Barry and his lawyers to conclude that he enjoyed the right.

Accordingly, we cannot conclude that he is asserting a right that would have been, that he would learned [sic] he did not own, had he inspected the land records.

The court, therefore, declared that an "easement by estoppel" was established over and through the Park for the purpose of constructing and maintaining appellees' driveway.

This timely appeal followed. OSPIA appealed on the sole issue of the circuit court's establishment of the easement by estoppel in favor of appellees and appellees appealed the court's determination that the Undeveloped Land was part of the Park and not Park Drive. Additional facts will be provided *infra* as warranted.

## STANDARD OF REVIEW

When, as here, an action is tried without a jury, we review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Rule 8–131. The clearly erroneous standard requires an appellate court to "consider the evidence produced at trial in a light most favorable to the prevailing party." *Murphy* [*v. 24th Street Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915 (1999)]. A trial court's findings are clearly erroneous when they are not supported by substantial evidence.

The clearly erroneous standard only applies to the lower court's findings of fact, however. *B & P Enter. v. Overland Equip. Co.*, 133 Md.App. 583, 602, 758 A.2d 1026 (2000); *Nationwide Ins. Co. v. Rhodes*, 127 Md.App. 231, 235, 732 A.2d 388 (1999). When we consider conclusions of law, our review is more expansive. *Narayen v. Bailey*, 130 Md.App. 458, 461–62, 747 A.2d 195 (2000). We do not accord any deference to "pure conclusions of law." Instead, we must determine whether the trial court was legally correct. *Andy's Ice Cream, Inc. v. City of Salisbury*, 125 Md.App. 125, 137, 724 A.2d 717 (1999).

*Gregg Neck Yacht Club, Inc. v. County Comm'rs of Kent County*, 137 Md.App. 732, 751, 769 A.2d 982 (2001) (citations omitted).

Construction of deeds and plats is a question of law for the court and is subject to *de novo* review. *See White v. Pines*

*Cmty. Improvement Ass'n,* 403 Md. 13, 31, 939 A.2d 165 (2008) ("The interpretation of mortgages, plats, deeds, easements and covenants has been held to be a question of law. 'That, as a general rule, the Construction or interpretation of all written instruments is a question of law for the court is a principle of law that does not admit of doubt.'") (quoting *Gordy v. Ocean Park, Inc.,* 218 Md. 52, 60, 145 A.2d 273 (1958) (citations omitted)).

## LEGAL ANALYSIS

## I

OSPIA contends that the circuit court erred in concluding that appellees were entitled to an easement by estoppel. We agree.

In finding estoppel, the court opined that OSPIA was guilty of laches because it made "no effort" to preclude other landowners across Park Drive from the Barry Parcel from using driveways to access the Improved Roadway.[9] As grounds for its decision, the court cited to our decision in *Schaller v. Castle Dev. Corp.,* 111 Md.App. 40, 47, 680 A.2d 528 (1996), *rev'd on other grounds,* 347 Md. 90, 698 A.2d 1106 (1997), in which we held:

> The doctrine of laches is an application of the general principles of estoppel, and consists of two elements—negligence or lack of diligence on the part of the plaintiff in failing to assert his [or her] right, and prejudice or injury to the defendant. *Parker v. Board of Elec. Sup.,* 230 Md. 126, 186 A.2d 195 [(1962)]; *Croyle v. Croyle,* 184 Md. 126, 40 A.2d 374 [(1944)]. As set out in *Croyle:* "The very heart of

---

**9.** In their brief, appellees assert that the circuit court based its finding of laches pursuant to OSPIA's failure to challenge the recordation of the minor subdivision plat that created the Barry Parcel in 1967. The trial court's oral opinion, however, clearly indicated that its finding of laches was based upon OSPIA's failure to take any action regarding the driveways across Park Drive from the Barry Parcel. The portion of transcript appellees cite for their misstated proposition addresses OSPIA's *due process* claims arising from the 1959 and 1967 subdivisions, an issue not relevant to this appeal.

the doctrine of estoppel, through laches, is that the defendant's alleged change of position for the worse must have been induced by, or resulted from, the conduct, misrepresentation *or silence of the plaintiff.*" 184 Md. at 136, 40 A.2d at 379.

(Citing *Staley v. Staley,* 251 Md. 701, 703, 248 A.2d 655 (1968) (citations omitted) (emphasis added)).

The circuit court further concluded that "the land records that might have otherwise have [sic] informed Dr. Barry of his right or lack thereof to construct this driveway were so poorly drafted, ambiguous and conflicted" that "we cannot conclude that he was attempting to exercise a right that those records would have informed him he did not enjoy."

### *Equitable Estoppel*

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy." *Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986).

Three essential and related elements are generally necessary to establish equitable estoppel: 1) voluntary conduct or representation; 2) reliance; and 3) detriment. *Markov v. Markov,* 360 Md. 296, 307, 758 A.2d 75 (2000). "Clearly ... equitable estoppel requires that the voluntary conduct or representation constitute the source of the estopping party's detriment." *Knill,* 306 Md. at 535, 510 A.2d 546. Ultimately, whether or not an estoppel exists is a question of fact to be determined in each case.

Generally, wrongful or unconscionable conduct, on which a party relies to his detriment, is an element in the application of equitable estoppel. *Knill,* 306 Md. at 534, 510 A.2d 546. But, equitable estoppel may apply "even in the ab-

sence of any fraud or wrongful intent" to mislead, if "the actions or the inaction of the party estopped ... 'cause a prejudicial change in the conduct of the other'." *Zimmerman [v. Summers]*, 24 Md.App. [100, 120–21, 330 A.2d 722 (1975)] (citation omitted). Relying on *Travelers [Indem. Co. v. Nationwide Constr. Corp.]*, 244 Md. 401, 224 A.2d 285 [(1966)], what the Court said in *Zimmerman*, 24 Md.App. at 123, 330 A.2d 722, is pertinent here: "The rule now to be followed in Maryland is that equitable estoppel may be applied, not only when the conduct of the party to be estopped has been wrongful or unconscientious, and relied upon by the other party to his detriment, but also when the conduct, apart from its morality, has the effect of rendering it inequitable and unconscionable to allow the rights or claims to be asserted or enforced."

*Gregg Neck Yacht Club,* 137 Md.App. at 772–73, 769 A.2d 982 (citations omitted).

[A] claim of equitable estoppel, with respect to the title of real property, can only succeed where: "... the party claiming to have been influenced by the conduct or declaration of another to his injury was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties or both have the same means of ascertaining the truth, there can be no estoppel."

*Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners,* 380 Md. 106, 126, 843 A.2d 865 (2004) (quoting *Mountain Lake Park Ass'n v. Shartzer,* 83 Md. 10, 13–14, 34 A. 536 (1896) (citation omitted)).

The party relying on estoppel has the burden to prove the facts that create it. *Jurgensen,* 380 Md. at 125, 843 A.2d 865. To assert a claim of equitable estoppel, a complainant "normally would have to show that respondent made a representation." *Id.* at 125–26, 843 A.2d 865; *see White,* 173 Md.App. at 61, 917 A.2d 1129 (silence by owner as to use and ownership does not create estoppel); *Cf. Gregg Neck Yacht*

*Club,* 137 Md.App. 732, 769 A.2d 982 (affirmative disclaimer of ownership with other factors may base estoppel). Estoppel requires "voluntary conduct or representation." *Cunninghame v. Cunninghame,* 364 Md. 266, 289–90, 298, 772 A.2d 1188 (2001) (affirmative act or affirmative statement required for estoppel).

"[S]ilence will not raise an estoppel where there is no duty to speak or act." *Dahl v. Brunswick Corp.,* 277 Md. 471, 488, 356 A.2d 221 (1976); *see also White v. Pines Cmty. Improvement Ass'n,* 173 Md.App. 13, 917 A.2d 1129 (2007), *affirmed in part and rev'd in part on other grounds,* 403 Md. 13, 939 A.2d 165 (2008); *Savonis v. Burke,* 241 Md. 316, 319–20, 216 A.2d 521 (1966); *Klein v. Dove,* 205 Md. 285, 295, 107 A.2d 82 (1954). Moreover, a "party who has placed his written title on record has given the notice which every person is bound to know and respect. The law does not require him to go further." *Savonis,* 241 Md. at 320–21, 216 A.2d 521.

### *Parties' Contentions*

OSPIA contends that appellees did not meet their burden of proof in establishing estoppel and that, because it made no representations regarding the matters at issue, its "mere silence" cannot be the basis of an estoppel. Nor does the construction of other driveways or the grounds urged by the trial court, *i.e.,* that the land records were so poorly drawn that they might have suggested that appellees possessed a right which they did not enjoy, provide any basis for an estoppel. Moreover, appellees failed to act with reasonable diligence by neglecting to make any inquiry with OSPIA and in failing to conduct an inquiry as to their right to use the area abutting their property to install their driveway.

Notwithstanding that they did not investigate the land records to ascertain their rights respective to the Barry Parcel, appellees set forth the extensive conveyance history of Lot J and the surrounding properties which interpret the western boundary of the Barry Parcel. For instance, according to appellees, in the April 1959 conveyance of the Barry

Parcel, "there was nothing of record or otherwise to indicate that the .35 acre parcel would not have access to the [Improved Roadway]." Although the dash lines appeared on the 1910 plat, there had been no subsequent conveyances honoring those lines, no contention that those lines limited the confines of Park Drive and no contention that the title to one-half of the bed of the Undeveloped Land had not been granted to the abutting lots. Additionally, as stated by appellees,

> The 1920 Deed from the Severna Company to the Molters had definitively established [Park Drive] as abutting and adjacent to the .35 acre parcel as well as the other abutting lots. Houses which had been constructed on the three lots subdivided out of former Lot 4 were gaining ingress and egress ... to the Improved Roadway. Similarly, numerous lots had been developed on both sides of Maple and Holly Avenues and were gaining access from the perimeters of their rights-of-way to the dash line roadways within those rights-of-way.

Significantly, in 1967, Anne Arundel County approved the subdivision of the Barry Parcel. At that time, Anne Arundel County zoning and subdivision laws required that every newly created lot abut a street or have access to a street. MD. ANN CODE of 1957, § 32–32.[10] *See* Appendix 2.

Although OSPIA maintains that it acquired title to the "Park" and Park Drive by quitclaim deed in 1977, appellees insist that the record contains no evidence, subsequent to the recordation of the 1910 Plat, that supports OSPIA's interpretation of the Undeveloped Land as belonging to the Park. Furthermore, subsequent to its acquisition of the relevant properties in 1977, OSPIA took no action in regards to the already existing driveways on the properties opposite the Barry Property, nor did OSPIA intervene when yet another driveway was constructed in the mid–1990s.

---

**10.** Appellees cite to several other conveyances in which the Undeveloped Land was treated as belonging to Park Drive and not the "Park"; however, inclusion of every example cited by appellees, all of which advance the same proposition, would be cumulative.

Mr. Barry testified that he made no inquiry or investigation, of title or otherwise, as to his rights beyond the review of a "picture" in sales materials, nor did he at any time contact OSPIA regarding the contested land. Although the circuit court concluded that any action taken by appellees to investigate their rights to the Barry Parcel may have been futile, this does not relieve appellees of their burden to exercise due diligence.[11] *See Savonis*, 241 Md. at 320, 216 A.2d 521 (party seeking the benefit of estoppel must have acted with reasonable diligence); *see also Rupp, Trustee v. Johnston Co.*, 226 Md. 181, 190, 172 A.2d 875 (1961); *Johnson Lumber Co. v. Magruder*, 218 Md. 440, 448, 147 A.2d 208 (1958). Nevertheless, even if appellees had diligently reviewed the land records, as discussed *supra*, more is required to support a finding of estoppel.

OSPIA posits that "the sole basis for the declaration of estoppel, was the conclusion that driveways were constructed in other areas of the 'Park' which were in 'plain sight' of the Barry Parcel, and that OSPIA remained silent with respect thereto." However, a party's "lack of an earlier protest or complaint as to a structure does not render applicable 'the principle of estoppel for . . . mere silence as to rights of record does not create an estoppel." *White*, 173 Md.App. at 60, 917 A.2d 1129 (quoting *Klein*, 205 Md. at 295, 107 A.2d 82 (citation omitted)).

In *Klein*, 205 Md. at 287–88, 107 A.2d 82, suit was brought to enjoin an owner of a lot abutting a beach area shown on a recorded plat of a waterfront development from interfering with the use of a right of way and beach area by owners of interior lots in the development. The facts demonstrated that the owner of the abutting lot, and/or his predecessors in title, had blocked that access for "some years." *Id.* at 288, 107 A.2d 82. Rejecting the contention that the creation of the structure blocking the access and the lack of prior protest or complaint

---

11. Notably, a search of the deficient land records may, in fact, have put appellees on notice of OSPIA's interest in the matter.

by the owners of the interior lots gave rise to an estoppel, the Court noted:

> The appellants are charged with notice from the record that the bed of the right of way was never owned by their predecessor, and they took possession of it with knowledge that it did not pass to them under their deed.... "Nor does the absence of any earlier complaint or protest by the appellee, as to the existence of the now disputed structure, render applicable here the principle of estoppel for ... it is well settled that mere silence as to right of record does not create an estoppel."

*Id.* at 295–96, 107 A.2d 82 (quoting *Louis Sachs & Sons v. Ward,* 182 Md. 385, 395, 35 A.2d 161 (1943)).

In *White,* 173 Md.App. at 27–28, 917 A.2d 1129, property owners within the Pines on the Severn Community sued the Pines on the Severn Community Association, Inc., to establish their rights of ownership and their use of piers constructed by their predecessors in title on land owned by predecessors in title to the Association. We rejected the property owners' claims that estoppel could be established, notwithstanding the maintenance and use of the piers by the property owners for periods exceeding seventy years, because the construction of the piers, and their maintenance and use, could not establish an estoppel *where the land owners were silent* as to the use and ownership of those piers. *Id.* at 60–61, 917 A.2d 1129.

Noting that the "record is replete with conflicting evidence as to who owns or controls the piers and riparian rights" and citing *Klein, supra,* we rejected the property owners' claims of estoppel and held that the property owners

> could not rely upon their predecessors ... when their predecessors built piers and the land owners were silent as to their use and ownership.

\* \* \*

A party's lack of an earlier protest or complaint as to a structure did not render applicable the principle of estoppel

for ... mere silence as to rights of record does not create an estoppel.

*Id.*[12]

Appellees argue that *White*, 173 Md.App. 13, 917 A.2d 1129, is distinguishable from the facts of the instant case. Specifically, appellees point out that, unlike *White*, in which "an aggressive campaign to assert ownership began and appellants were thereafter on notice that exclusive rights were challenged," *id.* at 61, 917 A.2d 1129, here, although OSPIA "acquired its title in 1977, ... [it] took no action to assert ownership until thirty years later, during which period [appellees] had relied to their detriment on its inaction."

Appellees seemingly base their argument upon the incorrect assertion that the trial court based its finding of estoppel/laches on OSPIA's failure to take any action against the Barry Parcel when it acquired the surrounding property in 1977. *See* n. 9, *supra.* To the contrary, the circuit court based its finding of estoppel on OSPIA's failure to take action regarding the driveways of the lots across Park Drive.

Now, estoppel.... We rely upon [*Schaller*, 111 Md.App. 40, 680 A.2d 528], which explains that estoppel requires proof of the lack of diligence on the part of the Plaintiff and prejudice to the Defendant. Arising from a change in position, induced by or resulting from the Plaintiff's conduct or silence.

Here, the evidence demonstrated that at least three, perhaps five property owners have constructed a driveway into the park in the vicinity of the Barry property for the purpose of connecting to Park Drive.

Those driveways ... have been [there] for some time, and we were informed of no effort by [OSPIA] to preclude their use.

---

**12.** Notably, in *White*, 173 Md.App. at 27–28, 917 A.2d 1129, the property owners sought to estop the owner of the property on which their piers had been constructed from exercising rights of ownership over them. Here, however, appellees seek estoppel regarding a right to construct a driveway *not yet built.*

Moreover, in taking no enforcement action against those owners, or by requiring them to obtain post-hoc permission from [OSPIA], we find that [OSPIA] has demonstrated a lack of diligence.

Those driveways are located within the area of the park defined in this opinion as contested area. Dr. Barry indicated that for many years, he has seen those driveways from his vantage point on Lot J, which he previously owned, and from the subdivided .35 acre article.

As discussed *supra*, "equitable estoppel requires that the *voluntary conduct or representation* constitute the source of the estopping party's detriment." *Gregg Neck Yacht Club*, 137 Md.App. at 772, 769 A.2d 982 (quoting *Knill*, 306 Md. at 535, 510 A.2d 546) (emphasis added). Although appellees attempt to distinguish *White, supra*, they fail to cite a single voluntary act or representation made by OSPIA. That appellees relied to their detriment upon the failure of OSPIA to take any action regarding the other driveways is of no consequence. The salient point is whether OSPIA had taken *any* action or made *any* representation upon which appellees relied. This, they did not do.

Moreover, we are not persuaded by the circuit court's interpretation or application of *Schaller*, 111 Md.App. at 47, 680 A.2d 528. In *Schaller*, we stated that "[t]he very heart of the doctrine of estoppel, through laches, is that the defendant's alleged change of position for the worse must have been induced by, or resulted from, the conduct, misrepresentation *or silence of the plaintiff.*" *Id.* (citing *Croyle*, 184 Md. at 136, 40 A.2d 374) (emphasis added); *see also Parker*, 230 Md. 126, 186 A.2d 195. Notwithstanding this assertion, however, we concluded in *Schaller* that a finding of equitable estoppel was not in error due to the plaintiff's overt and voluntary assertion, relied upon by the defendant, and *not* pursuant to the plaintiff's silence. *Id.* at 43–44, 680 A.2d 528. Furthermore, neither of the two cases we cited in *Schaller*, noted above, addressed laches or estoppel in the context of a land dispute. *Id.*; *see Croyle*, 184 Md. 126, 40 A.2d 374 (dispute regarding divorce decree); *Parker*, 230 Md. 126, 186 A.2d 195 (dispute

relating to nominating petitions). Moreover, appellees have failed to cite to a single case in which equitable estoppel was found *without* an overt act or representation by a plaintiff.[13,14]

As explained *supra*, notwithstanding appellees' lack of diligence in researching the land records, a finding of estoppel must be supported by an overt act or representation. Neither the circuit court nor appellees have elicited any such act or representation; consequently, the circuit court erred in concluding that appellees were entitled to an easement by estoppel.

## II

Appellees contend that the circuit court erred in determining that the Undeveloped Land is part of the recreational area known as the Park. We agree.

### *Chains of Title*

The chain of title for the Barry Parcel and the surrounding properties at issue here began on June 9, 1906, with the

---

**13.** Appellees discuss at length their expenditures and efforts regarding the Barry Parcel. These efforts, although certainly evidence of detrimental reliance, are inapposite to a determination as to whether OSPIA committed a voluntary act or representation.

**14.** In appellees' reply brief, they cite to two additional cases, *J.F. Johnson Lumber Co. v. Magruder*, 218 Md. 440, 147 A.2d 208 (1958), and *Zimmerman*, 24 Md.App. 100, 330 A.2d 722. Neither of these cases, however, affords appellees any relief. In *Magruder*, 218 Md. at 448–49, 147 A.2d 208, which involved a mechanic's lien and in which an overt statement was the basis of the allegation of estoppel, the Court of Appeals reversed the finding of equitable estoppel, specifically noting that "one who claims the benefit of an estoppel must not only be free from fraud in the transaction, but he must have acted with good faith and *reasonable diligence;* otherwise no equity arises in his favor." As explained *supra*, appellees failed to act diligently. Furthermore, in *Zimmerman*, 24 Md.App. at 115–16, 330 A.2d 722, which addressed an action by a landowner to enjoin neighbors from crossing their property, although we discussed equitable estoppel, our focus was on prescriptive versus permissive easements, which are not relevant to this appeal. *Id.* at 122–24, 330 A.2d 722. Moreover, in *Zimmerman*, we ultimately concluded that estoppel did not apply and discussed the morality of a party relying on another's *conduct*—not silence—in evaluating whether to apply equitable estoppel. *Id.* at 123–24, 330 A.2d 722.

conveyance of 91.5 acres from Alice V. and Henry C. Bourke to the Annapolis Land and Improvement Company Corporation (Annapolis Land and Improvement Company). That company subdivided the property in August 1906 by recordation of a Plat of Subdivision of the Bourke Farm (the Bourke Farm Plat). *See* Appendix 3. Subsequent to recordation of that plat, a number of lots were conveyed, particularly for the issues in consideration, the conveyance of Lots 10 and 11, Section A, by deed dated April 12, 1907. *Id.* The metes and bounds description in this deed calls with the western line of Park Drive. The width of Park Drive is not specified on this plat.[15]

By deed dated August 18, 1908, the Annapolis Land and Improvement Company conveyed its entire holdings, with the exception of the previously conveyed lots, noted *supra*, to the Severn Realty Company. The Severn Realty Company then resubdivided the property acquired from the Annapolis Land and Improvement Company by a plat of 1908 (the 1908 Plat). *See* Appendix 3. A comparison of the Bourke Farm Plat and the 1908 Plat reveals that the latter has greater detail, with bearings and distances. *See* Appendix 3, 4. In the 1908 Plat, the right-of-way abutting the east side of Lot 11 follows the same general course as Park Drive, renamed Forrest Drive, but has changed from a fairly uniform width to a variable width with a large flare south of Lot J. *See* Appendix 4. The lots to the immediate North of Lots 10 and 11 have been reconfigured and designated with letters instead of numbers, including Lot O. *See Id.*

By Deed dated May 7, 1910, the Severn Realty Company conveyed Lot O, Section A, pursuant to the 1908 Plat. *See Id.* The deed specifically provided that the east boundary of the parcel binds upon Forrest Drive, thus creating a fee simple title to one-half of the bed of Forrest Drive abutting the lot.[16]

---

**15.** Although other lots were conveyed by the Annapolis Land and Improvement Company, they are located in different sections of the Bourke Farm Plat and are not relevant to this appeal.

**16.** Current Section 2–114 of the Real Property Article was also the law in 1910, having been codified in 1892.

Lot M, Section A, one lot removed to the North of Lot O on the 1908 Plat, was conveyed by deed by the Severn Realty Company on June 23, 1910. *See* Appendix 4. Although the metes and bounds description in that deed is silent as to Forrest Drive, the deed references the 1908 Plat, designating the lot's eastern boundary as the west side of the same right-of-way which the deed to Lot O established as Forrest Drive.

In August 1910, the Severn Realty Company recorded the 1910 Plat, a second plat for Severna Park, consisting of two sheets. The second sheet has two relevant notations. The first reads, "For conveyances and Title of Lots conveyed previous to Aug. 1st, 1910, refer to [the 1908 Plat]." The second notation states:

It is the intention of the Severn Realty Co. not to dedicate to the public, the streets, alleys, roads, drives, and other passage ways and Parks shown on this plat, except that the same may be used in common by lot owners and residents of Severna Park. All riparian rights being retained by the said, the Severn Realty Co.[17]

Notable changes relevant to this appeal between the 1908 Plat and the 1910 Plat include the renaming of Forrest Drive as Park Drive and the naming of the previously unnamed road immediately north of Lots K, J and I as Marlbrook Road. *See* Appendix 1, 4. South of Marlbrook Road, however, the configuration of Park Drive remains the same as that of Forrest Drive on the 1908 Plat. The primary difference is the addition of dash lines, including those enclosing the Undeveloped Land that extend down through the Park to the Severn River. *Id.*

On November 22, 1910, approximately three months following the filing of the 1910 Plat, title to Lot J was conveyed by the Severn Realty Company to William A. and Emma L. Hall by deed (the Hall Deed). *See* Appendix 1. The metes and bounds description in that deed begins "at a chestnut stump *near* the North side of Park Drive." (Emphasis added). The

---

**17.** Notably, although the circuit court found that the "Park" was a "recreational" area, the notation on the 1910 Plat provides no such restriction.

chestnut stump is depicted on both the 1908 Plat and the 1910 Plat. *See* Appendix 1, 4. Although Park Drive is not mentioned and no dimension is given for the width or diameter of the chestnut stump or on which side of it the beginning point is located, the metes and bounds description of the western boundary coincides with the abutting portion of the Undeveloped Land. The Hall Deed continues:

> Together with all and singular the rights, ways, waters, privileges, and appurtenances thereto belonging or in any wise appertaining, and with the use incommon [sic] of all streets, and parks appearing on said plat.

> To Have and To Hold unto the said parties of the second part . . . subject to all the agreements, stipulations, covenants conditions and restrictions contained and stipulated in a deed from the Severn Realty Company *et al,* to Edwin P. Samuels, dated August 18, 1908 . . . which are hereby accepted and agreed to by the said party of the second part. . . .

The deed to Samuels, which established certain restrictive covenants, also contained the following "agreements" and "stipulations" which passed to the owners of Lot J:

> Together with all and Singular the rights, ways, waters, privileges and appurtenances thereto belonging or in anywise appertaining, and with the use in common of all Streets and parks appearing on Said plat.[18]

On January 27, 1914, the Severn Realty Company conveyed Lot N by deed. *See* Appendix 1. That deed referenced the 1910 Plat and provided a metes and bounds description in pertinent part as follows:

> . . . thence North 40 degrees East 115.5 feet to Park Drive, *thence binding on the Southwest side of Park Drive* South 64 degrees 31 minutes East 130 feet, thence *still binding on Park Drive* South 46 degrees 4 minutes East 51.5 feet to Lot O . . . .

---

18. This provision was referring to the 1908 Plat.

Reference to the 1910 Plat reveals that the east boundary of Lot N coincides with the east boundary of Lot O on the 1908 Plat, which is described as binding on Forrest Drive, later renamed Park Drive. Notwithstanding the appearance of the dash lines on the 1910 Plat, the 1914 conveyance of Lot N provided that the eastern boundary of Lot N abutted Park Drive and essentially ignored the dash marks shown on the 1910 Plat.

The property of the Severn Realty Company had been mortgaged and, with the exception of lots previously conveyed, was acquired through foreclosure on March 15, 1916, by the Severn River Land Company, who conveyed it to the Severna Company by deed dated May 1, 1916. The Severn River Land Company also conveyed Lot K, by deed dated July 1, 1916,[19] to Otto S. and Emma A. Molter who, by deed of June 15, 1916, acquired Lot J from the Halls. *See* Appendix 1. The Lot K deed to the Molters referenced the 1910 Plat and provided a metes and bounds description as follows:

> Beginning for the same *at an iron pin by a chestnut stump on Park Drive,* which place of beginning is the beginning point of a lot of ground.... [B]inding on the south side of said Marlbrook Road south sixty two degrees west two hundred and forty nine feet to an iron pipe on the easternmost side of Park Drive thence binding on said Park Drive south sixteen and one half degrees east fifty nine and seventy five one hundredths feet south fifty seven and one quarter degrees east sixty six feet and south seventy six degrees east one hundred and thirty six feet to the place of beginning.

(Emphasis added).

Appellees point out that the reference to the 1910 Plat indicates that the last course in that description deviates from the dash line on the plat and continues as a dark line to join

---

**19.** Appellees speculate that this subsequent conveyance arose either pursuant to a preexisting contract or because Lot K was not included in the original mortgage.

the dark lines defining the western boundary of Lot J and the eastern boundary of the Undeveloped Land.

On September 20, 1920, the Severna Company conveyed Lot 3, part of Lot 2 and part of Lot 4, Block D, by metes and bounds description to the Molters. *See* Appendix 1. The Severna Company provided the following description in its conveyance:

... to the west side of Park Drive which is a public street running from Riggs Avenue to the waters of irregular lines, width and shape bounded on the east and northeast on lots 5 and 3, K and J of Section E and the Park as shown on the plats of record and on the west, northwest and southwest on Section D, Lots 4, 3, M, N and O, and 11 of Section A; and the land lying between the last mentioned lot (# 11) and the water....

No mention is made of the dash lines in the description, which holds the lot lines of the abutting lots, including Lot J, define Park Drive.

On November 22, 1944, the Severna Company executed a Deed of Easement to the Anne Arundel County Sanitary Commission. Two separate rights-of-way were granted, the one secondly described being relevant to the issues in this case. Specifically, that description reads, in pertinent part, as follows:

A 30 foot right-of-way running with a uniform width of 30 feet with the North 69° East 127 foot line of Lot 'J' Section 'E', the South 54° 45' East 70 foot line of Lot 'J' and the South 41° 45' East 123 foot line of Lot 'J'. ... being a strip of land running through the property shown as a park and with the road known as Park Drive, all as shown on a plat of Severna Park prepared by Reding & Howard in August 1910 ... and as shown on a Plat prepared by the Anne Arundel County Sanitary Commission in December 1943, a copy of which is filed herewith and as a part hereof.

According to appellees, that plat duplicates the dash lines from the 1910 Plat, but ignores them. Specifically, the plat shows the easement superimposed over the dash lines and not

located wholly within them, following, instead, a uniform thirty feet from the dark lines delineating the common boundary of Lot J and the Undeveloped Land. A second conveyance from the Severna Company to the Sanitary Commission, dated April 24, 1946, also attaches a plat on which the dash lines do not appear and the Undeveloped Land abutting Lot J and K is depicted as "Park Drive."

By quitclaim deed dated May 17, 1977, the Severna Company attempted to convey its remaining property to the Planning and Zoning Officer of Anne Arundel County, as trustee, for the purpose of reconveying the same to OSPIA. That deed and the deed of the same date from the Planning and Zoning Officer to OSPIA described Park Drive and the Park as different parcels. Parcel three in both deeds is Park Drive, which is described only as, "BEING all that road known as Park Drive, south of Riggs Avenue, running south from Riggs Avenue to the shore of the Severn River . . ." as shown on the 1910 Plat. The description of the "Park" in Parcel Six of both deeds is more detailed and reads as follows:

> BEING all that parcel of ground designated as "Park" area bounded on the south by the shore of the Severn River and on the north, east, and west by: the North 71° 45' West 2196' line from a stone near the southeast end of said line to the shore of the Severn River; south side of Lot 4, Block A, the east side of Lots 4 and 11, Block A; the south side of Lots O, J, I, B, C, D, E, F, G and H; and the North 66° 9' East 819.17' line; all as shown on two Plats of Severna Park, recorded among the Land Records of Anne Arundel County in Plat Book 12, folios 25, and 26; and said park further being known as the Hatton Memorial Beach.

Only the Park (Parcel 6), and not Park Drive (Parcel 3), is designated, "known as the Hatton Memorial Beach." Both deeds provide that the parcels conveyed shall be used only for community recreation purposes for the benefit of lot owners shown on the 1910 Plat. Subsequent confirmatory deeds from the Severna Company to OSPIA, dated October 28, 1991 and June 16, 1993, contained no such restriction.

At the hearing before the circuit court, John Dowling, accepted by the court as an expert surveyor, testified for appellees regarding the description of the Park contained in the 1977 quitclaim deed. Dowling testified that the "Park" does not extend north to the Undeveloped Land, but rather, ends at the southern lot lines of Lot O and Lot J as shown on the 1910 Plat. Appellees insisted that the 1977 quitclaim deed was ineffective to pass title to any portion of the Undeveloped Land, as that had already passed to the owners of the lots abutting the land by operation of law.

Various other conveyances established that, in referring to Park Drive, the dash lines have been uniformly ignored. A deed dated September 21, 1955 conveyed a portion of Lot M, in which the metes and bounds description in that deed called to, with and leaving Park Drive. Additionally, the accompanying plat depicts the outline of Park Drive with no dash lines. A Deed dated March 19, 1982 contains a modern description of Lot N by Edward Hall, III, which, like the original January 1914 deed for Lot N, calls to and binds on the westernmost right-of-way line of Park Drive. A deed of June 16, 1944, conveying Lot O, also contains a modern description, this time by J. Martinet and Company, a survey firm. Where the original May 1910 description of Lot O called to Forrest Drive, the new description calls to Park Drive as abutting Lot J, not the dash lines.[20]

On April 29, 1959, following several conveyances of Lot J, the then-current owners of Lot J, Gretchen Pfannenstiel and Leroy Pfannenstiel, conveyed 1.25 acres of Lot J to T. Kenneth and Nora Brown. The parcel retained by the Pfannen-

---

**20.** Appellees invite our attention to a variety of other instances whereby the dash lines abutting the eastern boundary of Lot J were either ignored or were simply not characterized as belonging to the "Park." Inclusion of every example cited by appellees, however, all of which advance the same proposition, would be cumulative. The examples cited *supra* sufficiently convey the essence of appellees' contention that, "[p]rior to the filing of OSPIA's Complaint for Declaratory Judgment in February, 2007, no one, including surveyors, title examiners and real estate attorneys, had contended that Park Drive was limited to the dash lines within the Park Drive Right–of–Way shown on the 1910 Plat."

stiels was not described until June 26, 1962, when it was conveyed by deed to the Browns. *See* Appendix 2. The metes and bounds description, by J.R. McCrone, Jr., Inc., of the smaller parcel contains .35 acres, beginning at a pipe found at the westernmost corner of Lot J as shown on the 1910 Plat and concludes as follows:

> thence continuing South 69 degrees West 44.02 feet to a pipe; thence with the Northeast side of Park Drive as shown on the above mentioned plat, North 54 degrees 44 minutes West 70 feet and North 42 degrees 17 minutes West 118.75 feet to the place of beginning.

Because this .35 acre parcel, which subsequently became the Barry Parcel was created without the benefit of a county-approved subdivision plat, the Browns commissioned J.R. McCrone, Jr., Inc., to prepare the previously mentioned minor subdivision plat, recorded with the re-recorded 1962 deed for the .35 acres from the Pfannenstiels to the Browns. On March 17, 1967, Anne Arundel County approved the subdivision of the Barry Parcel. By deed dated January 31, 1990, Ms. Brown, surviving tenant by the entirety, conveyed the separate parcels by separate descriptions to appellees.[21,22]

### Deed Construction

 " 'In construing the language of a deed, the basic principles of contract interpretation apply.' " *Conrad/Dommel, LLC v. W. Dev. Co.*, 149 Md.App. 239, 264, 815 A.2d 828 (2003) (quoting *Gregg Neck Yacht Club, Inc.*, 137 Md.App. at 759, 769 A.2d 982). "These principals require consideration of 'the character of the contract, its purpose, and the facts and

---

21. In addition to the 1.25 acre parcel and the .35 acre Barry Parcel, Ms. Brown conveyed a twenty-two foot strip of land used for ingress and egress prior to the improvement of Marlbrook Road.

22. Appellees again allude to their expenditures, efforts and expectations regarding the acquisition and their plans with the Barry Parcel. As before, however, these efforts are not relevant in that they offer no insight into the intent of Severn Realty Company, the grantor, in conveying Lot J.

circumstances of the parties at the time of execution.'" *Chevy Chase Land Co. v. United States,* 355 Md. 110, 123, 733 A.2d 1055 (1999) (quoting *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999) (citation omitted)).

Ordinarily, "the court gives effect to the intention of the parties, gleaned from the text of the entire instrument." *Gunby v. Olde Severna Park Improvement Ass'n,* 174 Md. App. 189, 242, 921 A.2d 292 (2007). However, courts often look to surrounding documentation to aid in understanding a grantor's intent if a provision is ambiguous. *Id.* at 243, 921 A.2d 292. As we explained in *Gunby:*

> The intention of the grantor is a question of fact, and "the surrounding circumstances ... must be analyzed in order to truly understand an unexpressed intention." *Koch* [*v. Strathmeyer,* 357 Md. 193, 198, 742 A.2d 946 (1999)]. As we reiterated in *Goss v. C.A.N. Wildlife Trust, Inc.,* 157 Md. App. 447, 459, 852 A.2d 996 (2004): "The 'true test' of what was meant by the language of the deed is 'what a reasonable person in the position of the parties would have thought it meant.'" (Citing *Chesapeake Isle, Inc. v. Rolling Hills Dev. Co.,* 248 Md. 449, 453, 237 A.2d 1 (1968)).
>
> We construe a deed without resort to extrinsic evidence, if the deed is not ambiguous. In "interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern without the assistance of extrinsic evidence." *Drolsum v. Horne,* 114 Md. App. 704, 709, 691 A.2d 742 (1997). We also consider the language of the deed "in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance." *Chevy Chase,* 355 Md. at 123, 733 A.2d 1055.
>
> * * *
>
> ... [W]hen the words in a deed "are susceptible of more than one construction," the deed is "construed against the grantor and in favor of the grantee...." *Morrison v.*

*Brashear,* 38 Md.App. 693, 698, 382 A.2d 353 (1978) (citation omitted).

*Id.* at 242–43, 921 A.2d 292 (citations omitted).

### *Appellees' Contentions*

The .35 acre Barry Parcel comprises the westernmost portion of former Lot J on the 1910 Plat. *See* Appendix 2. The metes and bounds description in the Hall Deed, which was the original conveyance of Lot J by the Severn Realty Company, begins "at a chestnut stump *near* the North side of Park Drive." Appellees point out that neither the word "near" nor the diameter of the chestnut stump are quantified. The last two courses in the deed description coincide with either Park Drive or, as the circuit court determined, the Park. Neither is mentioned in the description. On the 1910 Plat, dash lines are drawn within what appellees contend is the Park Drive Right–of–Way from Marlbrook Road south to the southern boundaries of Lots O and J. *See* Appendix 1. South of that line the word "Park" appears in four places east of the dash lines. *Id.* To the north of that line the words "Park Drive" appear, with "Park" being within the dash lines and "Drive" within solid lines north of Marlbrook Road. *See id.*

Appellees argue that, "in light of the guidance from the appellate courts, noted above, it is appropriate to look at the extrinsic evidence found in the land records, both before and after the recordation of the 1910 Plat and Deed." The Bourke Farm Plat established Park Drive as a right-of-way leading from Lot 11 and Severn Side Park to Riggs Avenue and beyond. *See* Appendix 3. Lot 11 was conveyed with reference to the Bourke Farm Plat and, by operation of law, acquired title to one-half of the abutting portion of Park Drive. *See* R.P. § 2–114. Thereafter, the Severn Realty Company acquired the holdings of the Annapolis Land and Improvement Company and subsequently recorded the 1908 Plat.

The description of Lot O, conveyed by the Severn Realty Company in May 1910, calls for and binds on Forrest Drive:

[T]he law in this State is well settled that, when a property owner subdivides property and makes or adopts a plat designating lots as bordering streets, and then sells any of those lots with reference to the plat, an implied easement of way "passes from the grantor to the grantee . . . over the street contiguous to the property sold."

*Koch v. Strathmeyer,* 357 Md. 193, 199, 742 A.2d 946 (1999) (quoting *Mullan v. Hochman,* 157 Md. 213, 221, 145 A. 554 (1929)).

The deed for Lot M, conveyed by the Severn Realty Company in June 1910, references the 1908 Plat and depicts its eastern boundary on the west side of the right-of-way accompanying Forrest Drive. Although the metes and bounds description in this deed does not specifically mention Forrest Drive, its designation on the plat abutting that right-of-way was sufficient to create an easement for the use of that right-of-way.

As we see it, a deed that is silent as to the right of way but refers to a plat that establishes such a right of way creates a rebuttable presumption that the parties intended to incorporate the right of way in the transaction.

\* \* \*

Therefore, absent an express provision to the contrary in the deed, those who purchase a lot with reference to a plat depicting an abutting street acquire a private easement in that street regardless of whether it has been dedicated to the public and accepted by the local government.

*Boucher v. Boyer,* 301 Md. 679, 689, 694, 484 A.2d 630 (1984).

The 1910 Plat, also recorded by the Severn Realty Company, changed the name of Forrest Drive to Park Drive and added the dash lines previously referenced. Similar dash lines were also added in the rights-of-way of Maple and Holly Avenues. *See* Appendix 1.[23]

In interpreting the Hall Deed, appellees insist that

---

23. Holly Avenue was not included in the section of the 1910 Plat appended to this opinion and Maple Avenue was reproduced only in

it is completely illogical to believe that the precise measurements [of Lot J] . . . could have been taken from a chestnut stump for which no dimensions are set forth. What is obvious is that the draftsman of that deed neglected to reference the iron pin or pipe which appears in the subsequent descriptions of Lot J. Specifically, in the June, 1916, deed of Lot J from the Halls to the Molters, an iron pin is established by reference to the description and the plat as being on the right-of-way line of Park Drive. The chestnut stump by that iron pin is near the north side of Park Drive. Michael Drum, the surveyor who had prepared [appellees'] variance submittal testified that, from a survey point of view, the chestnut stump is much nearer to the iron pin on the Park Drive Right-of-Way than the 30 feet which separates the stump from the dash lines which the circuit court determined to be Park Drive. The fact that the description of Lot J in the Hall Deed does not specifically call to Park Drive, as in the case of Lot M, is of no significance, given the fact that the 1910 Plat shows its western boundary as coterminus with the eastern boundary of the Park Drive Right-of-Way.

Appellees note that the deed for Lot N, prepared approximately three and a half years after recordation of the 1910 Plat, "clearly reflected the intention of the Severn Realty Company regarding [Park Drive]." Notwithstanding that Severn Realty Company was responsible for the dash lines on the 1910 Plat, appellees posit that the metes and bounds description in the Lot N deed ignores the dash lines and calls to and binds on Park Drive, establishing an easement for ingress and egress to the Improved Roadway across the Undeveloped Land.

Appellees further point out that, although the Severn Realty Company suffered foreclosure in 1916, its successors in title, the Severn River Land Company and the Severna Company,

part. Notwithstanding, the dash lines visible on the portion of Maple Avenue in Appendix 1 are representative of the dash lines abutting both roads.

by subsequent deeds, essentially ignored the dash lines shown on the 1910 Plat. The July 1916 deed from the Severn River Land Company to the Molters conveyed Lot K by a metes and bounds description which begins at the same iron pipe marking the corner of Lot J on Park Drive and concludes with a call to the easternmost side of Park Drive and two courses binding on Park Drive. In September, 1920, the Severna Company, which at that time owned all of the property formerly owned by the Severn Realty Company, conveyed Lot 3 and parts of Lots 2 and 4 by a metes and bounds description calling to the west side of Park Drive and binding on it. That deed came fewer than seven years after the Severn Realty Company's conveyance of Lot N and only ten years following the recordation of the 1910 Plat.

Appellees assert that OSPIA has failed to produce a single document of record in support of its contention that the dash lines are more than mere "embellishments" which Dowling, appellees' surveyor, believes them to be. Furthermore, maintain appellees, if the dash lines are, as the circuit court found, the limits of Park Drive, they must also indicate the limits of Maple Avenue and Holly Avenue, which would cause numerous lots to have no access to the actual roadway because those lots do not bind on the dash lines. Appellees aver that, because

> the single family dwelling units on these lots have been gaining access to these avenues for many years, it is apparent that the strained interpretation which the circuit court assigned to the dash lines was not the intention of the subdivision's developer. The 1977 quit claim deeds, which describe Park Drive and the Park as two separate parcels, reflect the clear understanding of the grantor, the Severna Company, that they are to be used for different purposes. The description of Parcel 3 (Park Drive) fits perfectly with the same grantor's description of Park Drive in the 1920 deed to the Molters. The description of Parcel 6 (the Park) confirms the understanding of that same grantor that the northernmost limit of the Park is defined by a line connecting the southern boundaries of Lot O and Lot J. There is

absolutely no basis for OSPIA's argument and the circuit court's conclusion that the Park somehow extends north of that line to border the eastern lot lines of Lots O, N and M and the western lot lines of Lot K and J between those respective lot lines and the dash lines.

Appellees contend that none of the various deeds, discussed *supra*, contain any reference to the dash lines or any restrictions on use, which "lead[s] to the inescapable conclusion that the Park Drive Right–of–Way, in its entirety, was intended for the use of all of the lots abutting it, including Lot J." [24]

### OSPIA's Contentions

OSPIA asserts that, at issue in this appeal is the intent of the Severn Realty Company in making its November 1910 conveyance to the Halls, which established the boundaries of Lot J. Not at issue, however, is the intent of other companies, such as the Severn River Land Company and the Severna Company in making conveyances of other lots/property within the Severna Park development at a later date. OSPIA maintains that, although those companies succeeded in title to unsold property within the Severna Park development, which was previously owned by the Severn Realty Company, those companies were not parties to the 1910 sale of Lot J, the November 1910 deed of conveyance or the 1910 Plat placed on record by the Severn Realty company. Consequently, the Halls and their successors in title to Lot J, as grantors, could not grant more than they received and the issue of whether the Barry Parcel bound on the "Park" or "Park Drive" turns on the intent of the original grantor, the Severn Realty Company, in conveying Lot J to William and Emma Hall, by the November 1910 deed.

---

24. Appellees raise the tangential argument that the 1910 Plat note, which provides for rights of use in common of roads, parks, and passage ways, in effect gives them the right to use an area of Park as a road. As the circuit court correctly concluded, a use in common for the Park does not include using the "Park" as a roadway. Appellees have provide neither facts nor law that would support their interpretation and we decline to address this contention further.

According to OSPIA, if the boundaries of Lot J, as conveyed by Severn Realty Company to the Halls in November 1910, did not extend to and bind upon Park Drive, no language in subsequent conveyances by subsequent grantors of the lot, or language in subsequent conveyances by the Severn River Land Company or the Severna Company, can make it otherwise.

OSPIA avers that "[t]he critical documents relied upon by the Court in answering this question are the November 22, 1910, deed, which conveyed Lot J out for the first time, as well as the August, 1910, plat prepared for the Severn Realty Company." On appeal, however, appellees focus on the extensive extrinsic evidence, outlined *supra*. OSPIA points out that neither the Bourke Farm Plat nor the 1908 Plat were in any way incorporated into, or referenced by, the November 1910 conveyance from the Severn Realty Company to the Halls. Furthermore, Lot J was conveyed by a metes and bounds description that made no reference to these plats. Rather, the Severn Realty Company placed a new plan of development on record by recording the 1910 Plat a few months prior to conveying Lot J to the Halls in November 1910. Consequently, according to OSPIA, the Bourke Farm Plat and 1908 Plat have little relevance to the issues presented by this case. Moreover, according to OSPIA, an examination of the Bourke Farm Plat and 1908 Plat do not support appellees' position. The Bourke Farm Plat provides a markedly different picture of development than that set forth in the 1910 Plat and the 1908 Plat provides no detail regarding the "Park" area to the south of what is now the Barry Parcel. *See* Appendix 1, 3, 4.

Although appellees argue that, pursuant to the 1908 Plat and the conveyance of Lot O, a "variable width" right of way was created that specifically granted the owners of Lot O a right of use for ingress and egress of the entire variable width of the right, OSPIA posits that, contrary to appellees' insistence, no deed referring to the 1908 Plat, nor the plat itself, provided for ingress or egress in relation to a "Variable Width" of any right-of-way. Additionally, although Lot O was specifically conveyed by Severn Realty Company as binding

on Forrest Drive, the 1908 Plat did not define Forrest Drive as it related to Lot O. Consequently, according to OSPIA, all that can be ascertained from the 1908 Plat is that the conveyance of Lot O bound to Forrest Drive, at most, at Lot O's eastern boundary.

The 1910 Plat set forth a plan of development different from that set forth on the 1908 Plat, which included, *inter alia,* dash lines not present on the 1908 Plat. *See* Appendix 1, 4. OSPIA insists that, by those dash lines, the Severn Realty Company designated several areas of "Park." It also enclosed "Park Drive" within dash lines, locating the drive approximately thirty to fifty feet from the boundaries of Lot J.

According to OSPIA, one of those areas of "Park" was drawn as abutting and binding upon Lot J. As shown on the 1910 plat, the "park wraps around the Barry [Parcel]." *See* Appendix 1. It is through this area that appellees propose their driveway. Six other areas of "Park" enclosed within dash lines were noted in proximity to the area of "Park" binding upon lot J on the 1910 Plat. *See id.* None of these enclosed areas of "Park" were shown on the 1908 Plat. *See* Appendix 4. With respect to the "Park" abutting Lot J, OSPIA contends that the dash lines enclosing the "Park" denoted both the western edge of that particular park area and the eastern edge of Park Drive. Additional dash lines were noted thirty feet to the west of the dash lines enclosing this park area abutting Lot J and the 1910 Plat noted "Park Drive" within the two sets of dash lines. OSPIA maintains that the two sets of dash lines thus created Park Drive as a drive of uniform dimensions and of a width not only consistent with the other roads shown on the 1910 Plat, but as well of the same width as Park Drive shown elsewhere on the 1910 Plat. *See* Appendix 1.

The Severn Realty Company's 1910 Plat also showed a marked contrast in its plan of development between the western side of the plat, containing lots M, N and O, and the eastern side, containing Lot J. OSPIA notes that, although the 1910 Plat designated a ten foot swath of land alongside the

western side of what is labeled "Park Drive," it did not designate this land as "Park." *See id.* In contrast, dash lines separate the eastern side of Park Drive from Lot J with an area of approximately thirty to fifty feet in width, specifically marked as "Park." [25,26]

At some point during its ownership, the Severn Realty Company caused to be prepared a marketing brochure (the Brochure) for the purpose of selling lots. The Brochure shows solid rather than dash lines in the relevant areas. *See* Appendix 5. All of the roads on the plat are lined with schematic trees, which are also depicted within the Park, although there are no notations of "Park" on the brochure. *See id.* OSPIA asserts that the brochure "confirms, frankly," the 1910 "[P]lat in terms of what the developer's intention was as to where he intended to locate Park Drive, as shown by the dotted lines...." According to OSPIA, the brochure depicted "Park Drive" within solid lines and running to the Severn River, drawn exactly where the dash lines enclose "Park Drive" on the 1910 plat. With respect to Park Drive, the brochure had "the same dimensions, the same curves," as shown within the dash lines on the 1910 Plat. The plat also showed the Park area abutting Lot J, like other Park areas, in green. OSPIA maintains that the Brochure fully supported the 1910 Plat and made clear that the dash lines were not an

---

25. OSPIA suggests that the narrow area between the dash lines alongside Park Drive may have been envisioned as sidewalk areas.

26. Although OSPIA contends that the Undeveloped Land ranges from at least thirty to fifty feet in width, whereas the eastern boundaries of Lots M, N and O are enclosed in dash lines by only a "ten foot" strip of land, appellees insist that this calculation is incorrect. Instead, appellees contend that the Undeveloped Land is smaller than thirty to fifty feet in width and that the "strip" of land abutting Lots M, N and O is actually between ten to twenty-eight feet along its length. Although we cannot ascertain the precise measurements of these respective parcels, a review of the 1910 Plat clearly shows that the strip of land abutting Lots M, N and O is, in some parts, comparable in size, if not larger, than parts of the Undeveloped Land. *See* Appendix 1. Consequently, any argument by OSPIA that the strip of land abutting Lots M, N and O is too small to designate as a "Park" or any assertion regarding the comparative sizes of the two parcels is unpersuasive.

"embellishment," but rather that they implemented a carefully considered plan of development establishing a "parked waterfront" with "Park Drive," leading through the area specifically shown within the dash lines, all the way to the water's edge.

Additionally, OSPIA insists that the deed of conveyance from the Severn River Company to the Halls is consistent with the changes reflected by the 1910 Plat and the Brochure. The deed provides in pertinent part:

> Beginning for the same at a chestnut stump *near the North side of Park Drive,* and running ... *to the south side of a road* now known as Marlbrook road, thence *bounding on* the South side of said road ... *along the south side* of said road *from its intersection with* Lennox Avenue, thence *leaving* Marlbrook Road....

OSPIA points out that the deed description provided that the boundary of lot J began "near," not "on" Park Drive. Thus, the plain language of the deed itself provides that the boundaries of the lot do not touch or bind upon Park Drive. As noted by Mr. Krause, who was accepted by the court as a title expert:

> They were very specific in their description that when they started at the Chestnut stump, the Chestnut stump to this developer who put this plat on record, Severn Realty Company is in the name of the plat. This is Severna Park by the Severn Realty Company.

> And they know that this chestnut stump, and they say it is near Park Drive, near the north side of Park Drive. It is not on Park Drive. It is not at the, you know; it's near. And near doesn't mean at or on.

Moreover, in the very same description, the Severn Realty Company specifically stated that the boundaries of the lot ran "to," "bound" upon, "intersected" with, were located "along," and "left" roads, when the grantor intended to do so.

As the court explained, "The point is if a guy writes a deed and in one part of it he says it touches a road and another part it does not say the same thing, it clearly shows that if he wanted to do it in the other place he could have, because he

knows how to do that." OSPIA insists that, had Severn Realty Company intended to bind the property on Park Drive, it would have expressly done so as it did with respect to Marlbrook Road in the deed description.

According to OSPIA, under the interpretation urged by appellees, the dash lines on the plat must simply be ignored. However, Severn Realty Company specifically modified the 1908 Plat to add these dash lines, enclosing numerous areas of "Park" not previously shown. Those dash lines corresponded with the location of Park Drive as depicted in the Brochure. OSPIA further points out that, whereas the roads on both the 1910 Plat and the brochure depict Park Drive as a generally uniform shape and constant width, under appellees' interpretation, Park Drive would be of a variable and uneven width.

OSPIA insists that appellees' reliance on language in a deed dated July 1, 1916 that references a deed conveying Lot K is misplaced. Notwithstanding the intent or wishes of the parties to the 1916 conveyance of Lot K, the boundaries of Lot J had been set by the Severn Realty Company six years earlier when it conveyed Lot J to the Halls.[27] That the Severn River Land Company, in conveying Lot K in 1916, departed from the boundaries established for Lot J by the Severn Realty Company in 1910, is of no consequence and in no way bears on the intent of the grantor in conveying Lot J to the Halls, in November, 1910. Moreover, appellees' reliance on the conveyance by the Severna Company[28] to another subsequent grantor of Lots 3 and 4, shown on Section J of the plat, which was made ten years after the controlling conveyance, is equally misplaced. In that later conveyance, the Severna Company referred to Park Drive as a variable width right-of-way—a

---

27. OSPIA notes that, although there was no reference to a pin by the chestnut stump in either the Hall Deed or the 1910 Plat, pins were located elsewhere on the plat.

28. As previously discussed, the Severn River Land Company acquired the foreclosed property of the Severn Realty Company in March 1916, after which it conveyed its holdings, with the exception of Lot K, to the Severna Company in May 1916.

notation which does not appear on the 1910 plat nor in any deed of the Severn Realty Company.

As noted by the circuit court:

[A]fter careful inspection of the August 1910 plat, the sales brochure and the subsequent land records, we find that [sic] a substantial weight of persuasive evidence that the Severn Realty Company intended the contested area to be part of the park, and that it is not a street or road. . . .

## *ANALYSIS*

OSPIA asserts that the only evidence to be reviewed to ascertain the intent of the Severn Realty Company, the original grantor of Lot J, are the 1910 Plat and the 1910 deed to the Halls conveying Lot J. Although, generally, "[w]e construe a deed without resort to extrinsic evidence," we do so only when the "deed is not ambiguous." *Gunby*, 174 Md.App. at 242–43, 921 A.2d 292. "[W]hen the words in a deed 'are susceptible of more than one construction,' the deed is 'construed against the grantor and in favor of the grantee. . . .' " *Id.* (quoting *Morrison*, 38 Md.App. at 698, 382 A.2d 353).

A review of the record discloses various ambiguities in the November 1910 deed to the Halls and in the 1910 Plat. As reflected in the 1910 deed to the Halls, the boundary to Lot J was "at a chestnut stump *near* the North side of Park Drive." Neither the word "near" nor the diameter of the chestnut stump are quantified. Additionally, the deed does not clarify whether its reference to "Park Drive" was referring to the edge of just the Improved Roadway, called "Park Drive," or Park Drive in its entirety, which would include any accompanying right-of-way. Moreover, the deed fails to reference any area of "Park" along the western boundary of Lot or make any specific reference to dash lines.

Although the dash lines on the 1910 Plat "wrap around" the southwest edge of Lot J, the plat contains no notations specifically within the Undeveloped Land to indicate whether the land is part of the Park or the right-of-way accompanying Park Drive. The inclusion of dash lines throughout the entire

plat, some of which, if treated as part of the Park, would block all access to various other properties, *i.e.*, along Holly and Maple Avenues, further establish that the characteristics of dash lines throughout the 1910 Plat are " 'susceptible of more than one construction.' " *Id.* (quoting *Morrison*, 38 Md.App. at 698, 382 A.2d 353).

As stated by the trial court,

[M]any of the references to the relevant areas in this subdivision are conflicting [and] ambiguous.... The November 1910 deed ambiguously called to a chestnut stump near the north side of Park Drive.... [I]t appears [that], in that deed of 1910, in the [1910 Plat], the drafters of the 1910 deed may very well have been looking at the plat drawn only three months earlier and ... concluded that its reference to Park Drive meant the entire contested area.... Thus, we had confusing language, I believe, in the deed with regard to the term Park Drive.... The land records ... were ... poorly drafted, ambiguous and conflicted....

In light of the ambiguities in the 1910 deed to the Halls and the 1910 Plat, a review of other deeds and extrinsic documents is appropriate. *See Gregg Neck Yacht Club*, 137 Md.App. at 759–62, 769 A.2d 982 (where language relating to a 1950 conveyance of forty foot strip of land was ambiguous, it was appropriate to consider 1962 and 1974 deeds of surrounding land, construction of a pier in 1959, various other characteristics of the land as well as action or inaction taken with regard to the pier in the years subsequent to 1950); *see also Kobrine v. Metzger*, 380 Md. 620, 638–39, 846 A.2d 403 (2004) (" '[A]n implied easement is based on the presumed intention of the parties at the time of the grant or reservation as disclosed from the surrounding circumstances rather than on the language of the deed,' and ... 'courts often refer to extraneous factors to ascertain the intention of the parties' ... [where] 'surrounding circumstances' " include plats, deeds and declarations.) (quoting *Boucher*, 301 Md. at 688, 484 A.2d 630).

As discussed *supra*, OSPIA contends that the trial court appropriately relied upon the Brochure in determining that the Undeveloped Land was part of the "Park" and not Park Drive. The Brochure shows solid rather than dash lines in the relevant areas. *See* Appendix 5. All of the roads on the plat are lined with schematic trees, which are also depicted within the Park, although there are no notations of "Park" on the brochure. *See id.* OSPIA asserts that the Brochure "confirms, frankly," the 1910 "[P]lat in terms of what the developer's intention was as to where he intended to locate Park Drive, as shown by the dotted lines. . . ." According to OSPIA, on the Brochure, Park Drive has "the same dimensions, the same curves," as shown within the dash lines on the 1910 Plat.

As appellees point out, however, the reverse of the Brochure touts "[a]bout a mile of fine sand beach" and "twenty-five acres of Parked Water Front." The 1910 Plat only provides for less than three acres of Park and just under one-half of a mile of beach. Only by including all of the roads lined with schematic trees on the Brochure can twenty-five acres of Park be attained. Moreover, if all the areas lined with schematic trees are considered part of the "Park," as explained *supra*, numerous properties would have no access to an abutting street. Additionally, in the Brochure, Park Drive appears to be narrow, but the Brochure does not detail the road's width or its location within its respective right-of-way.

Although the trial court relied primarily on the Hall deed of 1910, the 1910 Plat and the Brochure, we are not persuaded that those documents alone are sufficient to demonstrate Severn Realty Company's intent in conveying Lot J to the Halls. A further review of the other documents, subsequent conveyances of Lot J and conveyances of the surrounding properties indicate that a more appropriate interpretation of the 1910 deed is that a right-of-way to Park Drive, and not the "Park," abuts the western boundary of the Barry Parcel. We explain.

Although both the Bourke Farm Plat of 1906 and the 1908 Plat do not contain the dash lines or any defined area of "Park" contained in the 1910 Plat that is the subject matter of this appeal, the conveyances made pursuant to those plats are of some relevance. As recounted *supra*, Lot 11 was conveyed by the Annapolis Land and Improvement Company with reference to the Bourke Farm Plat, thus conveying ownership of one-half of the bed of Park Drive adjacent to the owner of Lot 11. Thereafter, on May 7, 1910, the Severn Realty Company, with reference to the 1908 Plat, conveyed Lot O by deed and specifically provided that the east boundary of the parcel binds upon Forrest Drive, thus creating a similar right where Lot O abutted Forrest Drive, later renamed Park Drive. The June 1910 deed for Lot M by the Severn Realty Company referenced the 1908 Plat and designated the same right of way which the deed to Lot O identified as Forrest Drive.

Although these conveyances took place prior to the filing of the 1910 Plat, a review of the January 1914 conveyance by the Severn Realty Company of Lot N is instructive. Although this conveyance took place nearly four years following the filing of the 1910 Plat, that deed called to and bound on the Park Drive, *but made no reference to the dash lines.* No future conveyances, including the conveyance of Lot J, detailed or referenced the dash lines found on the 1910 Plat. That Lots O, M and N were on the west side of Park Drive is of little consequence. The 1910 Plat clearly included dash lines on that corresponding side of Park Drive that were essentially ignored in both Severn Realty Company's later conveyance of Lot N and in all subsequent conveyances of Lot J and the surrounding properties.

Notwithstanding that all conveyances subsequent to 1916 were by parties other than Severn Realty Company, the grantor whose intent is at issue, those subsequent conveyances are helpful in interpreting the dash lines in the 1910 Plat, some of which occurred in close temporal proximity to the conveyance of Lot J to the Halls.

In the Severn River Land Company's conveyance of Lot K, on July 1, 1916, to the Molters, the deed called to and bound on the eastern side of the Park Drive as shown on the 1910 Plat without mention of, or any restriction regarding, the dash lines. Notably, the deed to Lot K recites the conveyance of Lot J from the Halls to the Molters, one month earlier, and suggests the understanding of the then-developer, the Severn River Land Company, that Lot J binds upon Park Drive. The deed to the Molters indicated that the starting point of Lot K, which also refers to the starting point for Lot J, begins *"at an iron pin by a chestnut stump on Park Drive."* When the Molters acquired Lot 3, part of Lot 2 and part of Lot 4, Block D, in September 1920, the description in that deed also called to and bound upon the Park Drive.

Numerous subsequent conveyances of Lot J and various other surrounding lots in the following years did not recognize or reference the dash lines on the 1910 Plat. The November 22, 1944 Deed of Easement to the Anne Arundel County Sanitary Commission shows the easement superimposed over the dash lines and not located wholly within them. A second conveyance from the Severna Company to the Sanitary Commission, dated April 24, 1946, also attaches a plat on which the dash lines do not appear and land abutting Lot J and K is depicted as "Park Drive."

A Deed dated September 21, 1955 conveyed a portion of Lot M in which the metes and bounds description in that deed called to, with and leaving Park Drive. The accompanying plat showed the outline of Park Drive with no dash lines. A deed of June 16, 1944, conveying Lot O, contains a description that calls to Park Drive without the dash lines. Notably, in 1967, Anne Arundel County approved the subdivision of the Barry Parcel. At that time, Anne Arundel County zoning and subdivision laws required that every newly created lot abut on a street or have access to a street, which could only have been provided *via* Park Drive. MD. ANN CODE of 1957, § 32–32.

Additionally, on May 17, 1977, by quitclaim deed, the Severna Company attempted to convey its remaining property

through the County Planning and Zoning Officer, as trustee, to OSPIA. In those deeds, Park Drive and the Park are described as separate parcels. The detailed description of the "Park" clearly excludes the contested area. The description of Park Drive is less precise, but comports with the description of Park Drive contained in the 1920 deed from the Severna Company to the Molters.

As discussed *supra*, the 1910 deed to the Halls and the corresponding 1910 Plat contained ambiguous terms and notations. Although the Brochure did support some of OSPIA's contentions, it too contained ambiguities. A review of subsequent conveyances, even if done by parties other than the original grantor, clearly and unequivocally indicated an interpretation that the Undeveloped Land was part of Park Drive and not the "Park." Additionally, the conveyance of Lot N, made by the same grantor as Lot J and pursuant to the same plat, ignored the dash lines that the grantor had included in said plat.

Notwithstanding that some evidence does tend to show that the Undeveloped Land was part of the Park, in light of the ambiguities and inconsistencies among the original deed and the 1910 Plat, and in light of the consistent subsequent treatment of Park Drive and the areas within the dash lines by Severn Realty Company in its 1914 conveyance of Lot N, by Anne Arundel County in approving the subdivision of the Barry Parcel and by all subsequent grantors and parties in interest of the relevant parcels, "when the words in a deed 'are susceptible of more than one construction,' the deed is 'construed against the grantor and in favor of the grantee....'" *Gunby,* 174 Md.App. at 243, 921 A.2d 292 (quoting *Morrison,* 38 Md.App. at 698, 382 A.2d 353). Consequently, we construe the ambiguities against Severn Realty Company and conclude that 1910 deed to the Halls established that the western boundary of Lot J, now the western boundary of the Barry Parcel, abutted a right-of-way to Park Drive and not the Park.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

### APPENDIX 1

### 1910 Plat

630

APPENDIX 2

## Subdivision of Barry Parcel

## APPENDIX 3

## Bourke Farm Plat (1906)

## APPENDIX 4

### 1908 Plat

APPENDIX 5

The Brochure